THE PEOPLE OF THE STATE OF NEW YORK, Plaintiff, *v.* ANGLO-AMERICAN SAVINGS AND LOAN ASSOCIATION OF NEW YORK and Others, Defendants.

CLARENCE A. SAMSON, Appellant; EDWARD D. CANDEE and Others, Respondents.

*Insolvent association — a plan for making over its assets, to another corporation, whose stock the stockholders of the association might elect to take, disapproved as calculated to work injustice and as not authorized in law — who may appeal from an order directing receivers of the association to carry the plan into execution.*

A savings and loan association, whose assets consisted largely of real estate heavily incumbered with mortgages, having become insolvent, a corporation was formed for the purpose of taking over its property. After the commencement of an action for the dissolution of the association the corporation submitted to the permanent receivers of the association the following proposition:

"*First.* It (the Empire State Realty Company) will purchase of you, as Receivers, on or before February 1, 1901, the Court entering a proper order of sale, all of the real estate in which said association is now interested, and pay therefor the present book cost value thereof, as the same appears from the books of said association, payment to be made by issuing to you, as Receivers, the bond of said company for the full amount of said purchase price, said bonds to be payable at the end of three years, from February 1, 1901, or sooner, in whole or in part, at the option of said company, to draw interest at the rate of 5 per cent, payable semi-annually, on the first days of August and February, and said bonds to be secured by a proper mortgage or mortgages upon the real estate interests so conveyed, said mortgage or mortgages to contain the usual interest, insurance and tax clauses, and to provide for the release of the lands mortgaged in parcels, as the same may from time to time be sold, upon the payment of such sum or sums as shall be provided in a schedule to be attached thereto, which schedule shall be prepared and submitted to you before the change of title and be subject to the approval of the Court; provided, further,

"*Second.* That upon the acceptance of this proposition by the Receivers and the obtaining a proper order of sale from the Court, The Realty Company will pay as part consideration for the sale $25,000 in cash for the use of the Receivers in carrying said properties until sale can be completed by order of the Court.

"*Third.* That as to the indebtedness of the Association for money borrowed The Realty Company will assume such indebtedness and secure releases therefrom to the Association, the amount of such indebtedness to be credited upon the purchase price of the property conveyed, any collateral thereto to be taken over by the Realty Company upon terms fixed by the Court.

"*Fourth.* If, at the time of passing title, shareholders of said Association shall, in writing, in person or by attorney, release said Association from all liability on account of their shares, then the purchase price of said property shall be abated to an amount equal to the book value of the shares so released; and from time to time thereafter, if shareholders representing 10 per cent of the then share liabilities of the Association shall in like manner release the Association, then the Receivers, if requested by the Realty Company, shall further abate from said bond and mortgage an amount equal to the book value of the shares so released.

"*Fifth.* To the extent of the cash payment above provided of $25,000 and the indebtedness of the Association assumed by the Realty Company, and to the extent of the share liability of the Association released by shareholders as aforesaid the purchase price shall be abated and property of the corresponding book cost value shall be exempted from the mortgage to be given by the Realty Company. A schedule of the same to be subject to the approval of the Receivers and confirmation by the court."

The receivers having applied to the court for instructions, the matter was referred to a referee who approved the proposal but recommended that the amount mentioned in the 2d paragraph thereof should be increased from $25,000 to $45,000, and that "the balance of the sum of $175,000 of preferred stock (of the Empire State Realty Company) should be paid in full and held in trust under such restrictions as will secure the application of the said moneys solely to the purpose of preserving, carrying and selling the said real estate." This report was confirmed, and the $45,000 mentioned in the modified proposal was paid to, and used by, the receivers.

Thereafter a person who had, by order of the court, been made a party to the action for the dissolution of the corporation, and who had appeared before the referee, took an appeal from the order authorizing the receivers to accept the proposal.

*Held,* upon such appeal, that the plan was calculated to work injustice to the non-assenting stockholders and did not place all of the stockholders upon an equal basis; that the book-value of the stock of the association being $2,320,194.84, and that of the realty company only $2,000,000, all the stockholders of the former could not, if they desired, exchange their stock for stock in the realty company; that a stockholder was put to his election to accept, or refuse to accept stock in the realty company before he could know what was the distributive value of his stock in the association; that the plan contemplated that the receivers should set aside a certain class and amount of assets to the payment of the assenting, and another class and portion of the assets to the payment of the non-assenting, stockholders, and it did not appear that the interests of the two sets of stockholders would be equally protected thereby; that it was in violation of the ordinary and statutory duty of receivers of insolvent corporations; that it was not within the province of the Supreme Court to allow the sale of the properties of the association upon a mortgage for the entire consideration with a condition that the amount might be abated from time to time by the realty company's delivering up stock of the association, procured by it

in any method, at a valuation not then ascertained by any legal proceedings or other method than the statement of its value to be found in the books of the corporation;

That, as the appellant had been authorized to appear before the referee, he was entitled to appeal from the order confirming the referee's report notwithstanding the receiver's acceptance and use of the $45,000 paid by the realty company.

*Semble*, that the receivers would be estopped from taking such an appeal.

APPEAL by the defendant, Clarence A. Samson, from an order of the Supreme Court, made at the Kings County Special Term and entered in the office of the clerk of the county of Kings on the 25th day of February, 1901, granting the petition of the receivers of the defendant Anglo-American Savings and Loan Association of New York for instructions respecting a proposal by the Empire State Realty Company to purchase certain perishable property for the benefit of shareholders of the association, and authorizing and directing the said receivers to accept such proposal.

*William Hepburn Russell* [*William Beverly Winslow* with him on the brief], for the appellant.

*William B. Hornblower* [*E. L. Scofield, Charles A. Deshon* and *John L. Hill* with him on the brief], for the respondents.

GOODRICH, P. J. :

Owing to the haste in which the appeal was presented to this court, the record is meagre, but I have ascertained the facts partly from the unprinted files and the concessions of counsel in brief and on argument.

The Anglo-American Savings and Loan Association of New York (hereinafter called the association) was organized in 1891, under chapter 122 of the Laws of 1851, as amended by chapter 564 of the Laws of 1875. The 1st section of the act reads as follows :

" § 1. Any number of persons, not less than nine, may associate and form an incorporated company for the purpose of accumulating a fund for the purchase of real estate, the erection of buildings, or the making of other improvements on lands, or to pay off incumbrances thereon, or to aid its members in acquiring real estate, making improvements thereon, and removing incumbrances therefrom ; and for the further purpose of accumulating a fund to be returned to its members, who do not obtain advances as above mentioned,

when the funds of such association shall amount to a certain sum per share, to be specified in the articles of association."

The articles of association declare the purpose of the corporation in the precise language of the section quoted. Article 10 reads in part as follows: "The funds of this corporation which shall belong to the loan fund shall be loaned to the applicants offering to pay the highest premium therefor in addition to the stipulated six per cent per annum by way of interest, upon such terms and security as the board of directors may from time to time approve; provided, that the rate of interest shall be six per cent per annum, and the amount loaned shall not be more than fifty per cent of the appraised cash value of the property offered as security. All loans (except those made on a member's shares) shall be secured by improved real estate *first* mortgages." Article 11, section 6, provides: "The Board of Directors shall invest the funds of the corporation in improved real estate *first* mortgages not exceeding in amount fifty per cent of the appraised cash value of the mortgaged property; provided, that in the event there shall be a surplus in the treasury for which such investments cannot be found, then the Board of Directors may invest such surplus in bonds of the United States, or in and upon such loans and mortgages as savings banks in the State of New York are permitted by law to make investments."

The association continued in business until November, 1900, when it became insolvent. The condition of its affairs on November thirteenth is shown by the following statement taken from its books:

"CLOSE OF BUSINESS NOVEMBER 13, 1900.

"*Assets.*

| | | |
|---|---:|---:|
| Installment Mortgages | | $390,606 27 |
| Straight Mortgages | | 200,384 02 |
| Pearce Mortgages | $4,342,872 04 | |
| Less Prior Encumbrances | 2,225,827 50 | |
| (In effect, Equities in Property) | | 2,117,044 54 |
| Loans on Stock | | 54,351 50 |
| Real Estate | $420,577 45 | |
| Less Prior Encumbrances | 232,003 11 | |
| | | 188,574 34 |

| | |
|---|---:|
| Insurance Advanced... . ..................... | $256 12 |
| Bills Receivable.............................. | 3,306 61 |
| Furniture and fixtures......................... | 3,643 74 |
| Individual Accounts........................... | 10,911 52 |
| Interest, Premium and Fines Due.............. | 12,967 87 |
| Cash Deposited in Curran Case................ | 3,024 00 |
| Cash....................................... | 28,235 06 |
| | $3,013,305 59 |

*" Liabilities.*

| | | |
|---|---:|---:|
| Installment Stock (a)............ | $638,705 43 | |
| Do.      (b)........ ... | 135,484 41 | |
| | | $774,189 84 |
| Prepaid Stock (a)............... | $1,188,410 00 | |
| Do.   (b) ............. | 7,745 00 | |
| Do.   (c) ............. | 349,850 00 | |
| | | 1,546,005 00 |
| Bills Payable.... ............................ | | 262,140 51 |
| Canceled Stock ............................. | | 3,388 72 |
| Real Estate sold on Contract.................. | | 2,060 40 |
| Individual Accounts.......... .. ............. | | 55 01 |
| Advances by Directors to Protect Property....... | | 79,678 51 |
| Earned Dividends and Surplus................. | | 345,787 60 |
| | | $3,013,305 59 " |

On November twentieth the directors of the association addressed to the stockholders a circular letter setting out the statement of its affairs (*supra*), informing them " that, in order to realize such value, the properties of the Association must be protected and carried until sales can be made at their fair values, and that unless some suitable plan is at once adopted to this end the properties will be sacrificed under forced sales at a most serious loss," and that a real estate corporation (Empire State Realty Company) had been incorporated, which proposed to take over all the properties in which the association is interested at their book cost value to the association, giving back the bonds and mortgages of the realty company covering the properties at five per cent interest. The circular also con-

tained the following : " The members of the Association are given the privilege, and are earnestly requested, to exchange their stock in this Association at book value for stock in the Real Estate Company at par, and stock in the Real Estate Company, exclusive of preferred stock, will be issued only to the amount of such exchanges. To the extent of such exchanges of stock the mortgages given by the Real Estate Company to the Association will be surrendered and canceled.    From time to time, as sales of the properties are made and the proceeds accumulated, the Real Estate Company can distribute the same to its stockholders by a corresponding reduction of its capital, and its Articles of Incorporation provide that upon any such distribution, prior to final dissolution, twenty-five per cent. of the funds distributed shall be applied upon the preferred stock, and the remaining seventy-five per cent. upon the common stock.    In order to provide cash for carrying and selling the properties, the Real Estate Company will issue its preferred accumulative five per cent. stock for cash, at par, in such amounts as shall be requisite for such purposes, not exceeding in any case the sum of $175,000, and no such stock will be issued for other purposes ; and the members of this Association are given the privilege of subscribing for such preferred stock at par.    The excess of the appraised value of the properties over the book cost value will warrant the issue of preferred stock for the purpose of procuring cash to carry and sell the properties.    In the event of excess subscriptions for preferred stock it will be apportioned to subscribers on the basis of their holdings of stock in this Association.    Should applications for exchange of stock of this Association for the Real Estate Company's stock exceed the book cost value of the Real Estate so transferred, other assets of this Association to the extent of such excess will be transferred to the Real Estate Company."

The circular also stated that the plan had been submitted to and approved by the Superintendent of Banks.

The statement contained among its assets the item :

" Pearce Mortgages............    $4,342,872 04
Less Prior Encumbrances ....    2,225,827 50

(In effect, Equities in Property).............    $2,117,044 54 "

It appears that the Pearce mortgages were created by the association purchasing property subject to first mortgages in the name of Pearce, one of its employees, he giving back to the association the mortgages represented in the item of the assets last quoted. It was held by the Banking Department that by the transaction the association became in fact the owner of the fee of the real properties subject to the first mortgages, but, of course, that decision is not conclusive upon this court. These Pearce mortgages amounted to the exact sum which, according to the books, the association had invested in the purchase of the property represented by them. The properties lie, the greater part in the State of New York, the rest in other States. Previously to this time suits had been commenced for the foreclosure of the mortgages upon some of the property covered by the Pearce mortgages. Taxes also had accumulated, and the association was without funds to meet these obligations, and thus prevent the foreclosure of the mortgages and the sacrifice of the property covered thereby. The directors of the association had made advances to it for the purpose of paying such sums as were necessary to pay the interest and taxes, as the association was without funds with which to pay the same. The amount of such advances, as represented by the item, is $79,678.51.

After the issuing of this letter and some time in November, the Attorney-General commenced proceeedings to dissolve the association, and in that action Messrs. Dickinson and Dickey were appointed temporary receivers. The association appeared, and on January 5, 1901, a judgment of dissolution was entered in which Messrs. Candee and Wilbur were appointed permanent receivers. Meanwhile, and on December 27, 1900, the realty company having been incorporated with $175,000 of preferred stock already subscribed for, addressed to the temporary receivers a letter offering to carry out the proposition which the directors of the association had made to its stockholders. This letter contained the following propositions :

" *First.* It (the Empire State Realty Company) will purchase of you, as Receivers, on or before February 1, 1901, the Court entering a proper order of sale, all of the real estate in which said association is now interested, and pay therefor the present book cost value thereof, as the same appears from the books of said association, pay-

ment to be made by issuing to you, as Receivers, the bond of said company for the full amount of said purchase price, said bonds to be payable at the end of three years, from February 1, 1901, or sooner, in whole or in part, at the option of said company, to draw interest at the rate of 5 per cent, payable semi-annually, on the first days of August and February, and said bonds to be secured by a proper mortgage or mortgages upon the real estate interests so conveyed, said mortgage or mortgages to contain the usual interest, insurance and tax clauses, and to provide for the release of the lands mortgaged in parcels, as the same may from time to time be sold, upon the payment of such sum or sums as shall be provided in a schedule to be attached thereto, which schedule shall be prepared and submitted to you before the change of title and be subject to the approval of the Court; provided further,

" *Second.* That upon the acceptance of this proposition by the Receivers and the obtaining a proper order of sale from the Court, The Realty Company will pay as part consideration for the sale $25,000 in cash for the use of the Receivers in carrying said properties until sale can be completed by order of the Court.

" *Third.* That as to the indebtedness of the Association for money borrowed, The Realty Company will assume such indebtedness and secure releases therefrom to the Association, the amount of such indebtedness to be credited upon the purchase price of the property conveyed, any collateral thereto to be taken over by the Realty Company upon terms fixed by the Court.

" *Fourth.* If, at the time of passing title shareholders of said Association shall, in writing, in person or by attorney, release said Association from all liability on account of their shares, then the purchase price of said property shall be abated to an amount equal to the book value of the shares so released; and from time to time thereafter, if shareholders representing 10 per cent of the then share liabilities of the Association shall in like manner release the Association, then the Receivers, if requested by the Realty Company, shall further abate from said bond and mortgage an amount equal to the book value of the shares so released.

" *Fifth.* To the extent of the cash payment above provided of $25,000 and the indebtedness of the Association assumed by the Realty Company, and to the extent of the share liability of the

Association released by shareholders as aforesaid the purchase price shall be abated and property of the corresponding book cost value shall be exempted from the mortgage to be given by the Realty Company. A schedule of the same to be subject to the approval of the Receivers and confirmation by the court."

Intermediate the proposition of November twentieth, and December twenty-seventh, that is, on December fourth, an action against the association was begun in the United States Circuit Court for the southern district of New York by James W. Carpenter and others, holders of fifty shares of stock, residing in Pennsylvania, praying for an accounting, a receiver and an injunction, and a motion was made for a temporary receiver. On January 12, 1901, a motion was made for permanent receivers, the realty company meanwhile having been made a party to the action. This motion was denied by LACOMBE, Circuit Judge, in a memorandum, as follows : " The real question presented here is whether this Court should now take the action which it declined to take before, upon the expressed ground that it must be assumed that the State Court Receivers would properly safeguard the property and preserve it undistributed until final hearing. When order to show cause with temporary stay was granted, it was thought that the proposed sale of some $2,000,000 of its assets to a new company might be an improvidence which would require this Court to take action to prevent it. It appears, however, that, by reason of the mortgages, taxes, etc., on this particular property, it may be looked upon as perishable, and no improvidence on the part of the Receivers in thus disposing of it is shown. The stay is vacated and motion denied."

After the appointment of the temporary receivers, they presented to the Supreme Court the proposal of the realty company, by a petition for instructions. By order of the court on January 3, 1901, the matter was referred to ex-Judge GEORGE G. REYNOLDS, " to examine said proposition and take all relevant testimony relating thereto, including evidence regarding the assets and liabilities of said defendant corporation, and report the same, with his opinion thereon, with all convenient speed." The referee made his report on January twenty-third, stating the plan as follows :

" The essence of its plan is this: The association now has over two and one-quarter millions of assets, being more than three

quarters of its entire assets, in the form of equities in real estate, which are substantially perishable by reason of the underlying mortgages thereon, upon which foreclosures are imminent and unavoidable. Unless these equities are protected against foreclosures, the result will be the substantial elimination of these assets, as the Receivers are without means to protect them. The proposal of the Realty Company is to take over all these equities at their full book cost value and furnish a fund of $175,000 for the purpose of paying interest and taxes and otherwise safeguarding them against the underlying mortgages, and conserving and carrying them until they can be sold to advantage. The assenting shareholders, to the extent of their stock in the Association, which is to be released by them, will thus, through the Realty Company, take their share of such equities at the book cost value; and the non-assenting shareholders will, through the Receivers, take a mortgage from the Realty Company to the extent of their share of such equities at the book cost value. So that the fund of $175,000 will safeguard the assenting shareholders' equities for the purpose of advantageous sales thereof for their benefit, and will also safeguard the non-assenting shareholders' equities for the purpose of paying their mortgage thereon. Further, and as an incident, the Realty Company will assume the debts which the Association has incurred for borrowed moneys, and obtain for the Receivers a release therefrom, and will accept real estate equities at full book cost value to the amount of the indebtedness thus assumed. Further, in order to protect the properties pending the preparation of the schedules and the transfer of title under the proposal, the Realty Company will pay the Receivers $25,000 in cash upon approval of this proposition, and will accept real estate equities at full book cost value for this sum. In this way the most perishable assets, those most liable to loss, are purchased at full book cost value and protected against sacrifice. The remaining assets which are not purchased by the Realty Company and which will remain in the hands of the Receivers, are relatively the more valuable assets, consisting largely of installment first mortgages, and include, as a margin against any shrinkage in the assets not purchased, the entire book surplus of the Association, amounting to $167,526.55."

He concluded by saying : " After careful consideration I am of the opinion that it is to the best interest of all concerned that the pro-

posal of said Realty Company should be approved by the Court and accepted by the Receivers. I, however, recommend modifications of said proposal in the following particulars : *First,* the said Realty Company, upon the approval of the proposal by the Court, should pay the sum of $45,000 to the Receivers in lieu of the sum of $25,000, which is insufficient for the purpose, to protect the property pending the closing of title. *Second,* the balance of the sum of $175,000 of preferred stock should be paid in full and held in trust under such restrictions as will secure the application of the said moneys solely to the purpose of preserving, carrying and selling the said real estate."

On the motion to confirm the report of Judge Reynolds, the permanent receivers presented to the court an affidavit opposing the confirmation of the report approving the proposal of the realty company, but the report was confirmed on January thirty-first by the Special Term (Gaynor, J., in an opinion hereto appended). *

---

* Opinion of Gaynor, J., at Special Term:

Gaynor, J. :

I have looked into this matter with great care, and am satisfied that the proposition to sell the real estate to the new company organized to take it is beyond doubt for the best interests of the shareholders, and should be carried out. Such real estate is heavily incumbered with mortgages, and unless interest and taxes be paid foreclosures will ensue and the property will be sacrificed. I am satisfied that the receivers will be unable to prevent this from coming to pass to a large extent. All shareholders may exchange their stock for shares of the new company *pro rata,* and it seems to me that every shareholder should do this. It is not a time for bickering and listening to those who want to stir up strife and lawsuits for their own emolument. And let the shareholders understand that all of the other assets remain in the hands of the receivers to be marshalled and distributed to the shareholders. It is only the real estate which is being transferred to the new company, and that company immediately puts up a fund of $175,000 to pay interest and taxes already accumulated, for which preferred stock is to be issued. Such real estate is taken by the new company at its full value as shown by the books of the insolvent company, and a mortgage is given back for such value. If any shareholders of the insolvent company do not wish to exchange their shares for shares in the new company *pro rata,* then they may hold them and get their *pro rata* share of such mortgage when it is paid. Above all things all litigation should be avoided. The shareholders may well trust the receivers, for they are worthy of confidence, and I commend to the receivers to avoid litigation and see that their legal advisers do likewise. The assets may easily be consumed in large part if propensity to obstruction and litigation be permitted by the receivers.

Application granted.

After the judgment of dissolution and during the pendency of the proceedings before the referee, that is, on January fifteenth, Clarence A. Samson, by order of the court, was made a party defendant to the action brought by the Attorney-General, with leave to be heard on all questions thereafter brought to a hearing. An order was also made on January nineteenth permitting C. L. Waring to appear before the referee as attorney for certain stockholders and in their behalf.

On the hearing before the referee the Attorney-General, the counsel for both temporary and permanent receivers, and of the realty company, and Mr. Samson appeared and took part in the proceedings.

It will be observed that neither Judge Reynolds nor Mr. Justice Gaynor nor Judge Lacombe expressly discussed the question of the power of the Supreme Court to approve the acceptance by the receivers of that part of the proposal of the realty company which provided for the exchange of the stock of the association for the stock of the realty company or the abatement and reduction of the mortgage of the realty company by the surrender of stock of the association obtained by it, a matter to be considered hereafter, but inferentially they have recognized the existence of that power.

I find nothing in the record or in the unprinted proceedings on file which shows that any suggestion was made before the referee as to the power of the court to direct the acceptance of stock of the association in payment of the whole or any part of the mortgage, and, indeed, from my examination of the testimony, it would appear that the entire scope of the proceedings was simply for the purpose of ascertaining whether the plan would be likely to result in the ultimate benefit of the stockholders.

The order of Mr. Justice Gaynor approved the modification of the proposal as recommended by ex-Judge Reynolds increasing the payment to be made by the realty company from $25,000 to $40,000. After the entry of that order, and on February twenty-sixth, the realty company paid the permanent receivers $45,000, which sum they accepted and have used (excepting $35) in paying " interest, etc.," on the mortgages.

Thereafter, and on March seventh, Mr. Samson appealed from the order of Mr. Justice Gaynor, and it is this appeal which is now

before us.  After this appeal was taken, and on March eleventh, Mr. Justice MAREAN granted a stay of proceedings pending the appeal, delivering an opinion, which is hereto appended.*  In his opinion, for the first time, so far as the record shows, the question of the legality and propriety of permitting the realty company to pay the receivers on account of the purchase money of the properties to be taken by it such portion of the stock of the association, at its book value, as might be exchanged by the stockholders thereof for the stock of the realty company was judicially discussed.  And the doubt which arose in his mind on this question was his reason for granting the stay until the decision of the appeal.  The Special Term in March also made an order enjoining the holders of mortgages who had commenced actions for the foreclosure thereof from

---

* Opinion of MAREAN, J., at Special Term:

MAREAN, J. :

The defendant is in the hands of receivers as an insolvent corporation.  An appeal has been taken to the Appellate Division by certain shareholders from an order of the court authorizing the receivers to sell certain incumbered real estate, constituting the greater part of the assets, for a certain sum, about $2,000,000 upon a credit of five years at five per cent interest, a mortgage back to be taken upon each parcel for the price of that parcel having five years to run.  The purchaser is the Empire State Realty Company, a corporation having no assets other than the real estate so to be purchased and a sum of money to be employed in reduction of prior incumbrances thereon.  The insolvent corporation owes debts to about $300,000, and the book value of its shares amounts to $2,320,000.  Besides the real estate sold it has assets of doubtful value, amounting nominally to about $600,000.

The order appealed from authorizes the receivers to accept from the Empire State Realty Company in payment of its mortgages to be taken for purchase money, a surrender at their book value of any shares in the insolvent company which it may be able to acquire, whether by purchase for cash or in exchange for its own common stock.

The wisdom and propriety of the sale for the price agreed and upon the credit agreed is not questioned by the appellants.  The only vice of the order which they claim should result in its reversal lies in the provision last referred to.

An application is made to me for a stay on appeal.

It should not be granted unless the appeal is meritorious.  It should be granted if it is.  I am compelled, therefore, to examine to some extent the merits of the appeal, and I have reached the conclusion that a stay should be granted.  It may be conceded that unless some one comes forward and takes the real estate and carries it for a time, in some way stopping the mouths of prior incumbrancers in the meantime, so as to save it from forced sale, it is likely to be sacrificed, and

selling the property under any judgment or decree of foreclosure which might be obtained therein.

This brings me to a consideration of the two questions which lie at the foundation of this appeal: *First*, as to the jurisdiction and power of the Supreme Court to make the order from which this appeal is taken; and, *second*, as to the right of the appellant Samson to appeal from the order after the receivers have elected to take, and have taken, the benefit of the provision for advancing the sum of $45,000 to be applied to the general benefit of the stockholders and creditors of the association.

I start with the proposition that it is the primary duty of the receivers of the association to take into their custody all the property belonging to it, to reduce the same to money as speedily as circumstances will permit, and to apply such cash proceeds first to the payment of the debts of the association, and next to distribute the balance among the stockholders equally.

---

that the sale in question, notwithstanding the long credit for the whole purchase money, ought to be approved. *But, even to save the entire insolvent estate from utter and complete destruction, no court can lend itself to an unjust and inequitable division of the salvage among shareholders; better that the whole should perish.*

The criticised provision of the order amounts to this, that the receivers shall pay to the realty company out of the insolvent estate the full book value of such shares as that company may by any means acquire. (The means by which they propose to acquire such shares are of no consequence whatever.) It does not even direct such payment to the present shareholders, but only to the realty company when it shall have acquired their shares. Those shareholders who decline to accept what the realty company is pleased to offer them must take their dividend out of what remains in the hands of the receivers of the insolvent estate. The estate being insolvent and so adjudged, it must be assumed that shares cannot be paid in full; that each share will be entitled only to a dividend of something less than its book value. The order appealed from provides for the payment of shares held by the realty company in full and puts the whole loss on the rest. Even if the proposed scheme should be carried out, and the realty company should acquire $2,000,000 of the book value of shares by exchange therefor of its own common stock (the limit of its common stock is $2,000,000), there would yet be left $320,000 book value of shares deprived absolutely of any participation in the proceeds of the real estate and remitted altogether to what is left of the assets of doubtful value remaining in the hands of the receivers after the payment therefrom of the debts amounting to $300,000.

I conclude that the order provides for an unequal and unjust division of the insolvent estate among shareholders, and that the execution of the order ought to be stayed until the appeal can be heard.

In *Matter of Receivers of Globe Insurance Co.* (6 Paige, 102), where the receivers were appointed pursuant to the statute of January, 1836 (Chap. 3), it was held that they were subject to the control of the Court of Chancery in the execution of their duties, and that any order of the court is not only obligatory upon them but binding on all creditors of the corporation, so long as it remains in full force; and that the remedy of receivers' or dissatisfied creditors is by an appeal.

An action by the Attorney-General, to procure a judgment dissolving a corporation and appointing receivers to wind up its affairs, is a creation of the statute (Code Civ. Proc. § 1786), and ordinarily it may be said that such receivers have only such powers as are conferred by statute. Section 1793 of the Code of Civil Procedure provides that a final judgment in an action brought to procure the dissolution of a corporation "must provide for a just and fair distribution of the property of the corporation, and of the proceeds thereof, among its fair and honest creditors, in the order and in the proportions prescribed by law, in case of the voluntary dissolution of a corporation." This refers to part 3, chapter 8, title 4, article 3 of the Revised Statutes (2 R. S. [9th ed.] pp. 1912, 1913), where section 79 directs the order in which the receivers shall distribute moneys in payment of debts, and section 83 provides that if, after the payment of the final dividend, any surplus remains, they "shall distribute the same among the stockholders of such corporation, in proportion to the respective amounts paid in by them, severally, on their shares of stock."

This is a clear and simple recognition of the principle that every stockholder has a *quasi* lien upon, or an interest in, all the assets of the corporation, for the value of his distributive share of such assets, after the payment of the corporate indebtedness. He is entitled to have a sale of assets for cash or its equivalent, and cannot be compelled to submit to an exchange of his lien on the assets for a lien upon, or interest in, other securities.

The respondents, however, contend that the Supreme Court has inherent power, notwithstanding the statute, to make an order for the disposition of the assets in such manner as shall appear to be for the ultimate benefit of the stockholders; and if the proposal, the acceptance of which has been approved by the court, did not con-

tain the provision for the payment of the purchase money to be made by the realty company for the assets of the association, in the stock of the association at its book value, there would be no question. Certainly, the Supreme Court has power to direct the sale of the properties on credit and mortgage. The vice of the plan consists in the fact that it attempts to compel all the stockholders to accept stock in the realty company for their stock in the association, or to take the chance of realizing from the assets which are not transferred to the realty company and which may not be sufficient to pay the unascertained distributive value of their stock. The plan, apparently, discriminates unjustly between stockholders who accept the proposal and those who refuse to accept it; and while the order of the Special Term refers the matter to Judge REYNOLDS as referee to supervise the performance of the proposed agreement and provide a plan for the protection of the interests of the parties, and especially to protect the interests of the non-assenting stockholders, the condition still remains that the non-assenting stockholders are not protected from discrimination between the assets left to secure their stock and those to be received by the assenting stockholders.

I am aware that the Supreme Court has exercised extensive powers in attempting to save creditors and stockholders from loss, but a careful examination of the instances cited in the elaborate brief of the respondents' counsel has failed to show a case which has gone to the length of approving any proposal at all similar to that under consideration.

In the first place, the book value of the stock of the association, installment and prepaid, amounts to $2,320,194.84. The stock of the realty company amounts to $2,000,000. If all the stockholders of the association should conclude to exchange their stock for stock in the realty company, there would not be sufficient stock of that company to make the exchange. In other words, holders of stock to the amount of $320,000 have not even the chance of an election. It is not sufficient that, as was said upon the argument, the stock of the realty company could be increased to meet the increased demand. There is no such proposition in the proposed plan, and that alone is what we are called upon to consider.

The proposed plan permits the receivers to accept in part payment or abatement of the amount of the mortgages, and instead of

cash, some portion of the stock of the association at its book value before it is possible to determine whether such book value is the actual value thereof. The stockholder is put to an election of accepting stock in the realty company or refusing to accept before it is possible for him to know what is the distributive value of his association stock. If the affairs of the association are wound up in the ordinary and usual way, no such election is imposed upon any stockholder. He will have his rights unaffected by an involved and inexplicable transaction, and will not be compelled to leap in the dark into an operation, the force and effect of which, after a careful investigation of the papers on file, I have not been enabled fully to understand.

The plan is tantamount to permitting the receivers to devote a certain class and amount of assets to the payment of assenting stockholders who receive in payment of their stock an amount which they deem equivalent to its full value, while the receivers are to set aside for the non-assenting stockholders another class and portion of the assets. There is nothing to show, but only a mere probability, that the non-assenting stockholders will receive what may be a fair equivalent for their shares, or an amount equal to that received by the assenting stockholders. This is a clear discrimination between the rights of assenting and non-assenting stockholders, putting them upon planes of distribution which may or may not be equal.

The effect of the scheme, so far as it relates to the abatement of the mortgage by the realty company's acquisition of the stock of the association, is equivalent to the purchase by an insolvent corporation of its own shares from its stockholders, and would seem to be *ultra vires* and beyond the power of the court to authorize. (2 Thomp. Corp. § 2054.)

There are various elements which must enter into the ascertainment of the real value of the shares of the association. The book value is not at all conclusive. While the schedules of liabilities presented to the referee purport to contain all the indebtedness of the association there has been no advertisement for claims, and it is not certain that none exists; and this may be a material element in determining the value of the stock. The real value of each share is affected by the value of every other share of the association. On some of these shares subscriptions may be unpaid. Some may have

been forfeited.    Until these facts are ascertained the equality of or difference between book value and actual value cannot be determined, and until it is determined it is inequitable to put a stockholder to his election as to whether he will exchange his stock for realty stock.    The stockholders have no method of determining the correctness of the book value estimate of their shares, or whether they will gain or lose by the exchange of their stock for stock of the realty company.

In addition to this, it may be possible that a claim will be made that the directors are liable for investing money in the Pearce mortgages, in violation of the 10th and 11th articles of association (*supra*), in reference to which I express no opinion.    If such a claim were successfully asserted and collected the stockholders would quite probably be insured against any substantial depreciation in the book value of such of the assets as are represented by the Pearce mortgages item.    Yet the proposal states that stock in the realty company will be issued only to such shareholders of the association as shall release the association from liability on their shares.    Such release of the association might possibly release the directors from liability, and it is evident that the shareholders are forced, in advance of any judicial investigation or decision as to the liabilities of the directors, to decide whether they will relinquish a claim which may afford them complete indemnity against loss.

Still further, if the assets were sold by the receiver at public auction it would be to the interest of the directors as well as stockholders to secure the largest possible price for the assets, which might far exceed the book value, as was suggested in *Mann* v. *Butler* (2 Barb. Ch. 367).

In *Mason* v. *Pewabic Mining Co.* (133 U. S. 50) a bill was filed by stockholders in the company, on behalf of themselves and any others who wished to join with them, in which it was alleged that the charter of the company had expired and that resolutions had been adopted by a vote of 27,919 shares against 6,754 in the negative authorizing the sale of the company's property to a new corporation, " and that the stock of such new corporation shall be issued to and received by the stockholders of this company in payment for the same, stockholders to have the right to receive (an) equal number of shares in (the) new company, if they so elect, on surrendering

certificates of this company within thirty days after April 12, 1884, and in case a stockholder does not take stock of the new corporation he is to receive his *pro rata* share in money." The language of the court seems peculiarly instructive in the case at bar (pp. 58, 59): " It is further said that in the present case the dissenting stockholders are not compelled to enter into a new corporation with a new set of corporators, but have their option, if they do not choose to do this, to receive the value of their stock in money. It seems to us that there are two insurmountable objections to this view of the subject. The first of these is that the estimate of the value of the property which is to be transferred to the new corporation and the new set of stockholders is an arbitrary estimate made by this majority, and without any power on the part of the dissenting stockholders to take part, or to exercise any influence, in making this estimate. They are, therefore, reduced to the proposition that they must go into this new company, however much they may be convinced that it is not likely to be successful, or whatever other objections they may have to becoming members of that corporation, or they must receive for the property which they have in the old company a sum which is fixed by those who are buying them out. The injustice of this needs no comment. If this be established as a principle to govern the winding up of dissolving corporations, it places any unhappy minority, as regards the interest which they have in such corporation, under the absolute control of a majority, who may themselves, as in this case, constitute the new company, and become the purchasers of all the assets of the old company at their own valuation."

Mr. Thompson, in his work on Corporations (Vol. 7, § 8269), says: " In the absence of a constitutional, statutory or charter provision existing prior to the formation of the usual compact among the stockholders and hence forming a part of it, a majority of them have no power to involve the minority in a reorganization without their consent, in such manner as to compel the minority to elect between a new contractual relation with a new company, and the loss of their shares in the old company or compensation for them on any arbitrary basis which the organization may give."

1 am very strongly of opinion that the order of the Special Term authorizing the carrying out of the proposal of the realty company

is calculated to work injustice to the non-assenting stockholders; that the plan does not place all of the stockholders upon an equal basis; that it is in violation of the ordinary and statutory duty of receivers of insolvent corporation; that it is not within the province of the Supreme Court to allow the sale of the properties of the association upon a mortgage for the entire consideration with a condition that the amount may be abated from time to time by the realty company's delivering up stock of the association, procured by it in any method at a valuation not then ascertained by any legal proceedings or other method than the statement of its value to be found in the books of the association.

The respondents contend *secondly* that the appellant is estopped to appeal from the order by the receivers' acceptance and use of the $45,000 paid by the realty company and their application of that sum to the indebtedness of the association. It may be admitted that the receivers represent and are trustees for all shareholders in the association (*Attorney-General* v. *Guardian Mut. Life Ins. Co.,* 77 N. Y. 272) and that the receivers personally are estopped to appeal from the order, but it by no means follows that Samson, who was made a party to the proceedings, after judgment of dissolution of the corporation, is concluded by the action of the receivers. The order authorized him "to be heard on all questions that may hereafter be brought to a hearing, including said reference now pending before Judge REYNOLDS." Having been authorized thus to appear, he is clearly empowered to take an appeal from the order confirming the referee's report.

For these reasons, the order should be reversed.

All concurred, except WOODWARD, J., not voting.

Order reversed, with ten dollars costs and disbursements.