EMERY *v.* KALAMAZOO & HASTINGS CONSTRUCTION CO.[1]

1. PARTNERSHIP ASSOCIATIONS—VOLUNTARY DISSOLUTION.

> Two months before the end of the term of a partnership associa-
> tion, on a notice to members of a meeting for the considera-
> tion of a final settlement of the partnership affairs and the
> distribution of its assets, a resolution was passed to exchange
> its assets for stock in a railroad corporation, and divide it
> among its members. *Held*, that this was a voluntary wind-
> ing up of the affairs of the partnership association, and did
> not comply with the provisions of the statute (2 Comp. Laws,
> § 6087).

2. SAME.

> A majority of the stockholders of a limited partnership associa-
> tion have no power to wind up its affairs by exchanging its
> property for stock in a corporation, and compelling a non-
> assenting shareholder to become a member of the corporation,
> and accept stock for his holding.

3. SAME—ESTOPPEL.

> A member of a partnership association, by receiving payment
> from a corporation of a partnership note which the corpora-
> tion has assumed, is not estopped from objecting to the
> exchange of the partnership property for stock of the corpora-
> tion, made for the purpose of winding up its affairs.

4. SAME—RAILROADS—OWNERSHIP OF STOCK.

> The fact that all of the stock of a railway company is owned by
> a partnership association does not prevent a member of the
> partnership from objecting to the surrender of the railway
> company's note for additional stock in the railway company
> in settlement of the partnership affairs, on the theory that
> the debt of the railway is really the debt of the partnership.

Appeal from Kalamazoo; Adams, J.   Submitted Jan-
uary 8, 1903.   (Docket No. 17.)   Decided March 30, 1903.

Bill by Elma Cahill-Emery, individually and as guard-
ian of Lee H. Cahill and Margaret Cahill, heirs at law of
Leroy Cahill, deceased, against the Kalamazoo & Hast-

---

[1] Rehearing denied June 1, 1903.

ings Construction Company, Limited, William S. Dewing, James H. Dewing, and Charles A. Dewing, copartners as Dewing & Sons, Martha A. Watson, executrix of the estate of Amasa B. Watson, deceased, Annie F. Cobb, executrix of the estate of Thomas S. Cobb, deceased, Edward Woodbury, Henry F. Badger, G. Edwin Dunbar, Charles S. Burton, Frank A. Bush and Benjamin A. Bush, administrators of the estate of Frederick Bush, deceased, F. A. Bush and B. A. Bush, administrators, and Thomas Paterson, doing business as Bush & Paterson, and the Chicago, Kalamazoo & Saginaw Railway Company, to rescind certain action of the managers of the Kalamazoo & Hastings Construction Company, Limited, and to wind up its affairs.   From a decree dismissing the bill, complainant appeals.   Reversed.

*Charles S. McDonald* and *George B. Fowler* (*Edward Cahill*, of counsel), for complainant.

*Howard & Howard* and *Carroll, Turner & Kirwin,* for defendants.

MONTGOMERY, J.   This is a suit in equity brought by Elma L. Cahill (now Elma Cahill-Emery), in behalf of herself, as widow, and as guardian of her two children, Lee H. Cahill and Margaret Cahill, minors, heirs at law of Leroy Cahill, formerly of Kalamazoo, now deceased. The action is a stockholders' bill to rescind certain actions on the part of the managers of said construction company, to compel a restoration of the assets of the construction company, and to provide for the proper distribution of such assets among the members, and for the protection of its stockholders.

The Chicago, Kalamazoo & Saginaw Railway Company was organized January 17, 1883, and articles of association were amended December 10, 1887, when the authorized capital stock of the company was made $2,000,000. Of the $2,000,000 of authorized capital stock, only 715 shares were subscribed for, and only $5 per share—$3,575

in the aggregate — was ever paid in. No progress was made in building the road until 1886, when the various individual subscriptions to the stock of the railway company were bought up by F. A. Bush and W. L. Eaton, as trustees; at least, so much of the stock as was not subscribed for by the individuals who afterwards formed the Kalamazoo & Hastings Construction Company, Limited. Eaton was afterwards succeeded by W. S. Dewing as trustee, and thereafter this stock was held by W. S. Dewing and F. A. Bush, both of whom are defendants in this case.

The Kalamazoo & Hastings Construction Company, Limited, was organized September 21, 1886, as a partnership association, limited, under chapter 160, 2 Comp. Laws, which act is specially referred to in the articles of association. The members were partly made up from former subscribers to the railway company stock, and partly from other individuals. The capital stock was fixed at $200,000, which was paid in in cash. The intended business of the construction company was to build a railroad for the Chicago, Kalamazoo & Saginaw Railway Company, and this purpose was expressly stated in the articles. The road contemplated was to extend from Kalamazoo to Hastings, in Barry county. Leroy Cahill was a subscriber to the capital stock of the construction company in the amount of $12,500, which amount he paid in in cash. Mr. Cahill never owned any stock in the railway company. Leroy Cahill died October 8, 1898, and his widow and minor children succeeded to his interest in the construction company, and are the complainants in this case. This fact is admitted in the pleadings.

In pursuance of the purpose of the construction company, a contract was entered into between the construction company and the railway company, by the terms of which the construction company was to build a railroad from Kalamazoo to Hastings. The contract price for the construction of the road was to be $15,000 per mile in 5 per cent. bonds, and $7,500 per mile in capital stock of the

railway company.  Several modifications of the contract were made from time to time.  April 24, 1889, it was decided to extend the road from Hastings to Woodbury on the same terms and conditions as the previous contracts called for.  November 21, 1893, the contract was changed in regard to compensation and contract price, and by this change the construction company was to receive $15,000 per mile in 5 per cent. 50-year gold bonds, and $9,500 per mile in stock; the same to be in full for all demands for construction and equipment.  The road was completed, and trains running from Kalamazoo to Woodbury, September 1, 1889.  The entire length of the road up to November 1, 1895, was 44.21 miles.  The cost of the road to the construction company up to November 21, 1895, was $532,545.86 in cash.  This amount was derived by the construction company from the following sources: Capital stock paid in in cash, $199,575; borrowed on construction company coupon notes, $179,750; bonuses from towns, $69,507.31; assessment on stockholders of construction company, afterwards returned, $7,847.55; railway company notes, $20,650; earnings returned to road in new construction from September, 1889, to November 1, 1895, $55,216,— a total of $532,545.86.

After the completion of the road, it was found impossible to sell the bonds, and the road was operated by and for the account of the construction company.  Under the contract as it existed, no compensation was ever received by the construction company up to November 21, 1895, nor were any of the bonds or stock of the railroad turned over to the construction company, nor was any settlement ever made on that contract.  On November 21, 1895, a new arrangement was entered into between the construction company and the railway company.  By the terms of this agreement the construction company was to deliver to the railway company the road as then constructed between Kalamazoo and Woodbury, together with all equipment belonging thereto.  The railway company was to assume all the outstanding indebtedness of the construction com-

pany to the amount of $225,000, which included the coupon notes; the actual amount then outstanding being about $216,000. It was to give to the construction company a purchase-money note for $292,925, payable five years from date, with interest, and, in addition, to turn over to the construction company 3,785 shares of the capital stock of the railway company. This agreement was carried out, and the note was executed by the president and secretary of the railway company, dated January 1, 1896, and delivered to the construction company. This action on the part of the officers of the company was ratified by the railway company July 14, 1896. A certificate of 3,785 shares of stock in the railway company was also delivered to the construction company. In addition to the 3,785 shares of stock of the railway company issued to the construction company under this agreement for the purchase of the road, there were outstanding 715 shares of stock of the railway company, held in part by individual members of the construction company, and in part by Bush and Dewing, trustees, upon which 5 per cent. only had been paid in. This stock was now acquired by the construction company, and, in order to make these shares fully paid, the construction company gave its promissory note to the railway company for $67,925, or 95 per cent. of the par value of the 715 shares. This note was intended to be an offset to the purchase-money note of $292,925, thus leaving a net indebtedness to the construction company on said purchase-money note of the sum of $225,000, which is hereinafter referred to as the net note of $225,000. The transfer of the road to the railway company was effected January 1, 1896.

Prof. M. E. Cooley testified that in the fall of 1900 he made an appraisal of the physical properties of the railroad as then existing, and found the value to be $504,890. This did not include franchises. This appraisal, in connection with the report to the railroad commissioner December 31, 1900, shows that the common stock of the road had no value. There had been paid in $3,575 on 715

shares,—just the amount required by law.   It represented the control of the road.   As carrying with it the control of the railway, it had some value,—a few dollars per share if any one wanted to buy the road.   So far as the construction company was concerned, the common stock received by it cost the construction company practically nothing.   It represented no money paid in, and was virtually valuable only for the control of the road.   Such value as it had represented profits of the construction company on the contract.

September 21, 1895, the duration of the Kalamazoo & Hastings Construction Company was extended for five years, expiring September 21, 1901.   No material change occurred in the management of either company from January 1, 1896, until the fall of 1900.   The board of directors of the railway company and the board of managers of the construction company during this time was composed substantially of the same persons, most of whom are defendants in this action.

Some time in March, 1900, and previous to October 11, 1900, the interest of the Bowne estate and Henderson's interest in the construction company was bought up by Dewing & Sons, Badger, and Woodbury; amounting in all to some $60,000.   Dewing & Sons, Badger, and Woodbury then held $101,875 interest in the construction company, which was a controlling interest.   Later, on January 14, 1901, Dewing & Sons also purchased the interest of O. M. Allen, amounting to $5,000 of the capital stock of the construction company.   Up to October 11, 1900, the note of $292,925 was carried as a liability in the reports of the railway company, and was so reported on oath to the railroad commissioner, and on the *memoranda* which Mr. Potter testified were the only balance sheets which the company had, and from which he made up his annual reports to the railroad commissioner.

On October 11, 1900, and after Dewing & Sons, Badger, and Woodbury had secured a majority interest in the construction company, measures were taken to transform the

past-due coupon notes of the construction company into preferred stock of the railway company, and also to provide money for the extension of the road to Pavilion, some 11 miles south of Kalamazoo. A large part of the net earnings of the road had already been invested in a right of way, etc., for such extension. In furtherance of this plan, the construction company, at a meeting held October 11, 1900, at which meeting the defendants held a majority, voted to surrender the note for $292,925, and also 2,500 of the 4,500 shares of common stock of the railway company held by the construction company, provided the railway company would issue sufficient preferred stock to pay off the obligations of the railway company then outstanding, and extend the road, and also deliver back to the construction company its note for $67,925. There was a provision, also, that the stockholders of the construction company should have the right to subscribe to such issue of preferred stock *pro rata* to their holdings in the construction company. This was put in the form of a proposition emanating from the construction company to the railway company.

On November 15, 1900, at a meeting of the directors of the Chicago, Kalamazoo & Saginaw Railway Company, it was voted to accept the surrender of the note for $292,- 925 and 2,500 shares of common stock of the railway company, and to deliver up to the construction company its note for $67,925. It was also voted that the railway company issue $450,000 of 6 per cent. cumulative preferred stock for the payment of existing indebtedness and extensions of its line. This preferred stock could be called in and redeemed at par, with accrued dividends, on six months' notice. In case of the sale of the road or the bonding of the road, the first proceeds were to be applied to the payment of this preferred stock, before anything should be paid on the common stock. It was further provided that the preferred stock should not be sold for less than par and one share of common stock with each share of preferred; that it should be allotted to the members of

the construction company *pro rata* according to their holdings in the construction company, and, any member declining or failing to subscribe for or take the full amount, the stock not then taken was to be reallotted *pro rata*, and the balance to remain in the treasury, to be sold from time to time as the requirements of the road necessitated. An immediate issue of $300,000 was authorized. The issue of preferred stock was begun January 1, 1901, and between that date and July 1, 1901, $230,000 in amount was issued. After the beginning of this action, and before the trial, sufficient preferred stock had been issued to bring the total amount at the time of trial to $270,000.

Mrs. Cahill-Emery, complainant, was not present at the meeting at which the surrender of the note for $292,925 and 2,500 shares of common stock was voted. A short time after the meeting, in the winter of 1901, Mr. Emery, as representative for Mrs. Cahill-Emery, came to Kalamazoo and consulted with Mr. H. C. Potter in regard to the transaction. Mrs. Cahill-Emery held coupon notes of the construction company amounting to $12,500. Mr. Potter proposed that she take payment in preferred stock. After some consideration, Mrs. Cahill-Emery decided that she did not care to take perferred stock, and desired the money on her notes. Payment was then deferred until later. In the meantime Mrs. Cahill-Emery became dissatisfied, and protested against the surrender of the note and stock by the construction company.

On July 5, 1901, the directors of the railway company held a meeting, at which were present defendants Woodbury, J. H. Dewing, C. A. Dewing, W. S. Dewing, H. F. Badger, and G. E. Dunbar. These gentlemen held the majority of preferred stock then issued. At this meeting, after stating in a preamble the action of November 15, 1900, and the authorization of an issue of preferred stock and the surrender of the note for $292,925 and 2,500 shares of common stock, it further states that it now appeared that the proposal submitted did not meet with

the approval of all the members of the construction company, and that there was some misapprehension and dissatisfaction with the action taken. It was then voted to return to the construction company the 2,500 shares of common stock and the note for $292,925, and take back from the construction company its note for $67,925; "thus placing the two companies in the same position which they occupied prior to November 15, 1900." Pursuant to this vote the note for $292,925 was returned to the construction company by the railway company, and the common stock of the railway company, which had been issued as a bonus with the preferred stock, was returned by the persons who received it to the railway company, and by it turned back again to the construction company. Mr. Potter testified that Mrs. Cahill-Emery, the complainant, was the party dissatisfied, and was objecting to the proceedings. Mrs. Cahill-Emery was never a stockholder of the railway company. On July 9th, and four days after the railway company voted to return the note for $292,925 and 2,500 shares of common stock, Mr. Emery, in behalf of Mrs. Cahill-Emery, demanded and received payment on coupon notes of the construction company ($12,500) which Mrs. Cahill-Emery held, and payment of which the railway company had assumed by the act of November 21, 1895.

June 21, 1901, notice was sent out by the construction company, calling a special meeting of the members July 5, 1901, "for the consideration of a final settlement with the Chicago, Kalamazoo & Saginaw Railway Company, the distribution of the assets of the construction company, and the transaction of such other business as may be brought before the meeting." This meeting was adjourned to July 12th, when the meeting was held. At this meeting Mr. Emery, representing the complainant, was present, accompanied by counsel. The following preamble and resolution was offered by J. H. Dewing, and seconded by Mr. Woodbury:

" *Whereas*, the duration of the Kalamazoo & Hastings

Construction Company, Limited, expires by limitation September 21, 1901; and

" *Whereas*, this company holds an obligation of the Chicago, Kalamazoo & Saginaw Railway Company for $292,925, which is offset in part by an obligation of this company for $67,925; and

" *Whereas*, it is deemed expedient and advisable that the assets of this company be placed in such shape that they can be divided among its members: It is therefore

" *Resolved*, that the board of managers of this company be and are hereby authorized to accept from the Chicago, Kalamazoo & Saginaw Railway Company 2,250 shares, $100 each, of its common stock, and this company's note for $67,925, now held by the Chicago, Kalamazoo & Saginaw Railway Company, in full payment of their obligation of $292,925 and all other demands whatsoever."

Mr. Emery objected and filed a written protest. He also offered a substitute resolution as follows: "That the Kalamazoo & Hastings Construction Company, Limited, go into liquidation according to the laws of the State of Michigan,"—which was not seconded. The resolution being put to vote, the defendants voted " Yes," and Mr. Emery voted " No."

At the same meeting the following preamble and resolution was offered:

" *Whereas*, all the debts of this company have been assumed by the Chicago, Kalamazoo & Saginaw Railway Company; and

" *Whereas*, this company now has in its treasury 6,750 shares, $100 each, of the common stock of the Chicago, Kalamazoo & Saginaw Railway Company: Now, therefore, be it

" *Resolved*, that the board of managers of this company [meaning said construction company] be and are hereby authorized to divide among the members of this association the $675,000 of the common stock of the Chicago, Kalamazoo & Saginaw Railway Company now in its treasury *pro rata* according to the individual holdings in the company, taking individual receipts therefor."

On this resolution the defendants present voted " Yes," and Mr. Emery voted " No."

Immediately after the former vote a recess was taken, during which time a meeting of the railway company, which had already been called, passed a resolution accepting the proposition of the construction company to surrender the note for $292,925, offset by the construction company obligation for $67,925 and interest, and to accept in lieu therefor 2,250 shares of common stock of the railway company; and it was further voted to issue 2,250 shares of common stock of the railway company, and deliver the same to the construction company, with its note for $67,925; the same to be in full payment of all demands whatsoever. Pursuant to this resolution the railway company did issue 2,250 shares of common stock, and delivered the same to the construction company.

Mr. Potter testified that the consideration for this issue of stock was the note for $292,925, and nothing else. He also testified that the property value of this railroad had not been increased by this increase of stock, except that the obligation of the railroad had been paid, and that the net note of $225,000 was an obligation of the railway company. Mr. J. H. Dewing, manager of the road, testified that the issue of 2,250 shares of common stock decreased the indebtedness of the railroad $225,000. Mr. Potter further testified that the meeting was "cut and dried," and the resolutions prepared under the direction of Mr. Woodbury and the Dewings; that they consulted with Mr. Howard, as counsel for the railway company, in regard to it. Mr. Potter testified that previous to the meeting of July 12, 1901, the assets of the construction company consisted of the net note of the railway company for $225,000 and 4,500 shares of stock in the railway company; that after the meeting of July 12, 1901, the assets consisted of 6,750 shares of common stock of the Chicago, Kalamazoo & Saginaw Railway Company; that the vote of July 12th distributing the shares of common stock to the individual members of the construction company distributed all the assets of the company. The construction company had done no business as a construction

company since November 21, 1895. Between the meeting of July 12, 1901, and the time of expiration of the corporate life of the construction company, September 21, 1901, no business act was done by the construction company, and no further act towards dissolving the company was taken. Mr. Potter testified that he received the certificates for 2,250 shares of common stock of the railway company in payment for the net note of $225,000, and that he held the proportionate interest of the members of the construction company in his possession subject to their order.

It does not appear that any of the certificates of common stock of the railway company have been distributed to the individual members of the construction company. The defendants are now the owners or holders of all but a few shares of the preferred stock of the railway company. On or about August 5, 1901, the complainants made a formal request upon the officers of the construction company that they procure the redelivery of the net note for $225,000, and that they bring suit to set aside the whole transaction as being unlawful and fraudulent, which request the construction company, by its officers and board of managers, refused. Thereupon the complainants brought their bill. On the hearing, on pleadings and proofs, the bill of complaint was dismissed, and from this decree the complainants appeal.

The vital question in the case is whether the action of July 12, 1901, should be sustained. Section 9 of the act providing for partnership associations (being section 6087, 2 Comp. Laws) reads as follows:

"When any such partnership association shall be dissolved by the voluntary action thereof, its property shall be applied and distributed as follows: *First*, to the payment of all debts for wages of labor; *second*, to the satisfaction of its other liabilities and indebtedness; *third*, after payment thereof, the same shall be distributed to and among the members thereof, in proportion to their respective interests, in the following manner: *Fourth*, three liquidating trustees shall be elected by the members of the association, who shall have full power and authority to

wind up the concern, and distribute the net assets thereof among the members, under the direction of the circuit court of the proper county."

If this section applies to the action taken on July 12th, it is very clear that it was not followed. But it is contended that it does not, first, because this was not a voluntary winding up of the affairs of the partnership association, but was, rather, a termination of the business at the end of its term. We think this is not strictly accurate. The partnership term did not end until September 21, 1901. This action was taken in July preceding, and, so far as it amounted to a dissolution of the partnership association, it, constituted a voluntary dissolution. The notice sent out to the members was a notice of a meeting for the consideration of a final settlement of the partnership affairs and the distribution of the assets of the company. The resolution was a resolution for the division of the stock to be acquired by the trade *pro rata* among the shareholders in the partnership, according to the individual holdings in the company. We think it clear, therefore, that this was a scheme for the winding up of the affairs of the company, and that it is not authorized by the terms of this statute. We think it was entirely beyond the power of the majority stockholders to wind up the affairs of this company by exchanging its valuable property for shares of stock in another corporation, and compelling a certain shareholder to become a member of such corporation and to accept stock for his holding. We are unable to distinguish the case in this respect from *Mason* v. *Mining Co.*, 133 U. S. 50 (10 Sup. Ct. 224), where the whole subject is discussed, and the conclusion reached that such authority does not exist. See, also, 1 Mor. Corp. §§ 415, 416.

But it is claimed that complainant is estopped from objecting to this transaction by reason of her having accepted the money in payment of the coupon notes, after preferred stock had been issued in pursuance of the agreement of October 11 and November 15, 1900. It is very clear that she is not estopped from objecting to the dispo-

sition of this $225,000 net note, made on July 12, 1901, as this action had not been taken at the time she received pay on the coupon notes; and, furthermore, when the coupon notes were paid, the action by which the $225,000 net note had been surrendered to the railway company had been rescinded by both the companies, and the note returned to the construction company. The complainant then received her pay upon the coupon notes, as she had an undoubted right to do, unless the holders of the preferred stock should take some action to repudiate their purchase, either on the ground of fraud or want of power. No such action appears to have been taken by the holders of the preferred stock. So far as the record discloses, no complaint is made by them of the action of the railway company in rescinding the action of November, 1900, and in returning the $225,000 net note to the construction company. Indeed, the holders of nearly all the stock were parties to this transaction. If the preferred stockholders are content to rest upon the transaction as it stood after the rescission of the action of 1900, which was taken with the express purpose of placing the two companies in the same position which they occupied prior to November 15, 1900, it does not rest with them to complain that provision shall be made for the payment of the claim of the construction company in accordance with the legal rights of the respective parties; and we do not find that an estoppel arises against the complainant for having accepted payment for her coupon notes.

We do not overlook the contention of defendants' counsel that complainants are not in position to complain, for the reason that the payment of this note in the manner in which it was paid, provided for by the resolution of July, 1901, amounted to the surrendering of something of no value for stock of the railway company. The argument is this: That, as the construction company owned all the stock which the railway company had issued up to this time (not all of its authorized issue), the construction company was really debtor to itself, and that no harm was

done by the surrender of this $225,000 net note. But the fact remains that from the inception of these two companies, for reasons of their own, the parties formed and maintained to the last two organizations. There was no identity of corporations, nor can the stockholders of one company be said to be identical with the company itself. The rights of the construction company must be determined upon the same principles as though the stockholders were a different set of people.

We think the decree should be reversed, and the vote of July 12, 1901, be declared void and of no effect, and that the $225,000 note be returned to the construction company, and the 2,250 shares of the common stock of the railway company issued in place thereof be delivered up and canceled, and that the construction company be dissolved and wound up according to law, and its assets sold and converted into cash, and distributed among the shareholders as their interest may appear; or, at the election of the defendants, inasmuch as complainant is the only complaining party, a decree will be entered for the complainant for her one-sixteenth interest in the $225,000 net note, and providing for a sale of the stock of the railway company held by the construction company, and for the payment to complainant of one-sixteenth of the price at which it sells. The complainants will recover costs of both courts.

The other Justices concurred.