# MASON v. PEWABIC MINING COMPANY.

# PEWABIC MINING COMPANY v. MASON.

APPEALS FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE WESTERN DISTRICT OF MICHIGAN.

Nos. 168, 240. Argued December 17, 18, 1889. — Decided January 13, 1890.

On the dissolution of a corporation at the expiration of the term of its corporate existence, each stockholder has the right, as a general rule, and in the absence of a special agreement to the contrary, to have the partnership property converted into money, whether such a sale be necessary for the payment of debts, or not.

Directors of a corporation, conducting its business and receiving moneys belonging to it after the expiration of the term for which it was incorporated, will be held to an account on the dissolution and the final liquidation of the affairs of the corporation in a court of equity.

IN EQUITY. The court, in its opinion, stated the case as follows:

These are an appeal and a cross-appeal from a decree of the Circuit Court of the United States for the Western District of

Michigan. On March 31st, 1884, there was filed in the Circuit Court for that district the bill of complaint of Thomas G. Mason, William Hart Smith and Sullivan Ballou, who describe themselves as citizens of the State of New York, against The Pewabic Mining Company, a corporation existing under the laws of the State of Michigan, Johnson Vivian, a citizen of the State of Michigan, and Henry Billings, Thomas H. Perkins, Alden B. Buttrick and Daniel L. Demmon, citizens of the State of Massachusetts, and The Pewabic Copper Company, a corporation created under the laws of the State of Michigan. The bill professes to be filed on behalf of the complainants above named, and of all the stockholders in the Pewabic Mining Company who may desire to join herein and take the benefit of the proceedings of the court. The bill is too long to copy in full in this opinion. The substance of it is, that the complainants were members of the Pewabic Mining Company, a corporation organized under the laws of Michigan on the 4th day of April, 1853, with a capital stock of twenty thousand shares of $25 each, afterwards increased to forty thousand, which was invested in a copper mine near Houghton, Michigan. The complainants allege themselves to be, at the time of the filing of the bill, the owners of 2650 shares of the stock of the company. They allege that the charter of the company expired on April 4th, 1883, but that nevertheless the directors who were elected in March of that year, disregarding this fact, continued the ordinary business of the corporation, and among other things made an assessment of $88,000 on the capital stock, which was paid. They further allege that at the annual meeting of the stockholders on the 26th of March, 1884, for the election of directors and for other purposes, the following resolutions were adopted, against the vote and the protests of the complainants :

"*Resolved*, That the board of directors be authorized to sell and dispose of the property of the company for a sum not less than $50,000'; that the president and secretary be authorized to execute all conveyances necessary to carry out the contract for the sale of the property of this company made by the board of directors, and that the board of directors be,

and hereby are, authorized to close up the business of the company.

"*Resolved,* That it is the sense of this meeting of stockholders that the property shall be sold to a new corporation, organized under the laws of Michigan, on the basis of forty thousand shares, and that the stock of such new corporation shall be issued to and received by the stockholders of this company in payment for the same, stockholders to have the right to receive [an] equal number of shares in [the] new company, if they so elect, on surrendering certificates of this company, within thirty days after April 12, 1884, and in case a stockholder does not take stock of the new corporation he is to receive his *pro rata* share in money."

The vote in favor of the adoption of these resolutions was 27,919 shares against 6754 shares in the negative. On the same day a certificate of incorporation under the laws of Michigan was executed, forming the Pewabic *Copper* Company, and filed two days afterwards. Its capital stock was also forty thousand shares at $25 each, which was taken up by the defendant corporators, who, with two others, were named as the first directors, being the same persons who controlled the old company. The third article of this association declared that no cash is actually paid on the capital stock. The cash value of real and personal property conveyed to the company contemporaneously with its organization is the sum of $50,000.

The constitution of the State of Michigan declares, Article XV, section 10, that no corporation, except for municipal purposes or for the construction of railroads, plank-roads and canals, shall be created for a longer time than thirty years. A statute of Michigan (1 Howell's Statutes, § 4867) enacts that all corporations whose charters shall expire by their limitation, or shall be annulled by forfeiture or otherwise, shall nevertheless continue to be bodies corporate for the term of three years after the time they would have been so dissolved, for the purpose of prosecuting and defending suits by or against them, and of enabling them gradually to settle and close their concerns, dispose of and convey their property, and

divide their capital stock, but not for the purpose of continuing the business for which such corporations have been or may be established.

The bill prayed for an injunction and restraining order forbidding the defendants from carrying out the purpose of transferring the property of the Pewabic Mining Company to the new corporation. It also prayed for the appointment of a receiver to take charge of the effects of th Pewabic Mining Company, that they might be sold, the debts of the company paid, and the remainder of the proceeds distributed among the stockholders.

The defendants answered the bill, admitting substantially its principal allegations, stating as an excuse for continuing the operations of the company beyond the period of its thirty years' existence that they were not aware of the time when that thirty years expired. They assert that, in all they had done since, they had acted honestly and fairly, and had the assent of the majority of the stockholders; that the arrangement under which they proposed to transfer the property of the Pewabic Mining Company to the new corporation was one which met with the approval of the majority of the stockholders, and a still greater preponderance of the stock in the corporation. They allege that they offered to pay the dissenting stockholders for their stock at the rate of $50,000 for the value of the whole stock, which was the sum at which it was to be sold to the new company, or to permit them to exchange it for stock in the new company, share for share, and they insist that this was just and fair, and what they had a right to do, and that they should still be permitted to carry out this plan. They say that the complainants, in refusing to accede to the new arrangement, are acting in the interest of rival copper mining companies, whose mines adjoin that of the Pewabic Company, and that their object is to force a sale at public auction, when those companies, whose shareholders are wealthy, will have an unfair advantage in purchasing the property below its real value. They repeat their offer to pay the defendants for the *pro rata* value of their stock, estimating the whole at $50,000, or to exchange it for stock in the new company. Replication was filed.

The court refused the appointment of a receiver, but did issue a restraining order against the defendants to prevent the consummation of the sale to the Pewabic Copper Company. A special master was appointed, with all the powers usually possessed by a master in chancery, to whom the case was referred, with directions to ascertain what assets and property, real and personal, were owned by the defendant, the Pewabic Mining Company, on the 26th day of March, A.D. 1884, and also what assets and property, real and personal, said company owned at the time of filing the bill of complaint in this case, on the 31st day of March, 1884; and also to ascertain the fair cash value of such assets and property at the several dates aforesaid, distinguishing the value of the several parcels and kinds of said property, and for that purpose to take testimony and make report thereon.

The report of the master shows the value of the property belonging to the Pewabic Mining Company to be much greater than $50,000, and the defendants concede it to be worth $75,000, which they profess a willingness to pay. The master took many depositions as to the value of this property on the part of plaintiffs and defendants, and he says: "Between the extremes of the testimony I find it very difficult to say what these several parcels of property are worth, but for the purposes of this reference I find the value of the several classes as follows:

"Stamp mill plant, including pumps and buildings . $40,000 00
Mining equipment, not including dwellings . . 35,000 00
89 dwellings. . . . . . . . . . . . . 30,000 00
Wood and timber . . . . . . . . . . . 27,398 59
Mining supplies . . . . . . . . . . . 30,000 00
Cash on hand . . . . . . . . . . . . 9,197 32
Copper on hand . . . . . . . . . . . 43,757 66
Water front, stamp mill site . . . . . . . 2,000 00
Real estate and mining rights . . . . . . . 250,000 00
Mine buildings and shops . . . . . . . . 30,000 00
Bills receivable . . . . . . . . . . . . 1,058 67
                                        _____
"Total . . . . . : . . $498,412 24 ".

Upon final hearing, the Circuit Court decreed that the equity of the case is with the complainants, and "that the affairs of the Pewabic Mining Company be and are hereby decreed to be wound up." It then directs that "all the assets and property of the Pewabic Mining Company be sold at public vendue for cash to the highest bidder: *Provided*, That if at such sale the bid for the aggregate of the property and assets should not be in excess of $50,000 above the amount of the debts of the company existing at the time of the sale, then the arrangement for the sale of such property, made at the stockholders' meeting in Boston on the 26th day of March, 1884, as set up in defendants' answer, shall be carried out under the direction of the special master, hereinafter designated, and as provided by the resolution adopted by the stockholders at said meeting." . . . It was further ordered that "the cause be referred to Peter White, as special master, for the following purposes, and with the following powers, to wit : That said master proceed to ascertain the assets and property and the amount of debts of said Pewabic Mining Company, and to this end he may consider the evidence already taken in the cause, and may further, upon notice to the solicitors of the different parties, set days for hearing evidence, and either party may produce witnesses as in the ordinary course of a master's proceedings, and that he report to this court the proceedings and findings thereon, and that after ascertaining the assets and debts of said company, and making report thereof to this court, said master shall proceed to the sale of said property at public vendue to the highest bidder in one body, after giving the notice required by law, and that he make report thereof. And it is further decreed that if the highest bid for such property at such sale shall amount to more than $50,000 over and above the indebtedness of said Pewabic Mining Company, then that the arrangement for the sale of said property, made at said meeting of the stockholders at Boston, must be set aside and held to be null and void, and the Pewabic Mining Company be enjoined perpetually from selling to the Pewabic Copper Company, and that company is enjoined from receiving its transfer of the property." It is then decreed "that the

defendants Vivian, Billings, Perkins, Buttrick and Demmon, directors of said Pewabic Company, are not liable to pay to complainants and other stockholders any money received by them since the expiration of the charter of said Pewabic Mining Company, April 4, 1883, and that an accounting by said defendant directors is hereby denied as to such expenditure made by them after the expiration of the charter."

The complainants in the bill prayed an appeal from that part of the decree which refused the prayer for an accounting on the part of the directors of the Pewabic Company of their transactions since the date of the expiration of the charter. This appeal is numbered on our docket 168. The defendants all appeal from the principal decree, which directs a sale of the property and the distribution of its proceeds among the stockholders of the Pewabic Mining Company in the event that a sum is bid for all of said property in a lump which exceeds the amount of the indebtedness of the Pewabic Mining Company and the sum of $50,000, which appeal is numbered 240.

*Mr. Don M. Dickinson* (with whom was *Mr. Alfred Russell* on the brief) for Mason and others.

*Mr. Thomas H. Talbot* for Pewabic Mining Company and others.

The complainants have no absolute right to a compulsory sale. An order of sale in such a case as this is, like an injunction, "not of right but of grace." *Sparhawk* v. *Union Passenger Railway Co.*, 54 Penn. St. 401, 454. A court of equity is not bound to decree a dissolution, even when a majority of directors and stockholders request it to be done. *In re Niagara Ins. Co.*, 1 Paige, 258. The necessity for it must be clearly shown. In the present case it is entirely unnecessary. Fifteen-sixteenths of the stockholders resist the application for it. "The particular interest of the few must give way to the general interest of the many." *In re Niagara Ins. Co., ubi supra.*

The evidence shows that it is for the interest of the stockholders that the business should be continued. The interest

of the complainants in a compulsory sale is adverse to that of a great majority of the stockholders. Under such circumstances the interest of a "corporator" is not to be considered, *Irvin* v. *Susquehanna &c. Turnpike Co.*, 2 Penn. 466, 471; but the interest of the "company." *Filder* v. *London, Brighton &c. Railway Co.*, 1 Hem. & Mil. 489; *Waterbury* v. *Merchants' Union Express Co.*, 50 Barb. 157, 168; *Belmont* v. *Erie Railway Co.*, 52 Barb. 637, 662. The court will always inquire whether the bill is really a stockholders' bill, or whether it is brought to serve other purposes of the complainant. *Forrest* v. *Manchester, Sheffield &c. Railway Co.*, 4 De G. F. & J. 126, 130; *Sparhawk* v. *Union Passenger Railway Co.*, 54 Penn. St. 401, 454; *Ffooks* v. *Southwestern Railway Co.*, 1 Sm. & Gif. 142, 167; *Robson* v. *Dodds*, L. R. 8 Eq. 301.

It is within the power of a court of equity to permit the majority to go on with the work, imposing such terms in favor of the minority as it shall deem just. *Lanman* v. *Lebanon Valley Railroad*, 30 Penn. St. 42; *State* v. *Bailey*, 16 Indiana, 46, 51; *S. C.* 79 Am. Dec. 405.

The case nearest parallel to the present is to be found in England. A quarry company being in process of liquidation, with a view to winding up, the holders of a majority of the paid-up shares conceived the purpose of continuing the company, and accordingly, by a representative, prayed that "all further proceedings in relation to the winding up of the company might be stayed." One holder of a hundred and fifty shares, considering the experiments intended by the majority, and for which he would have to contribute, "would be fruitless," appeared in opposition to the above prayer, being "desirous that the liquidation should proceed, and the slate quarry sold in the usual way." He was not allowed to stand in the way of the wishes of his fellow-shareholders. He was merely allowed fourteen days "within which to elect whether he will remain a member of the company, or will retire and give up his shares;" on his election to retire, the value of his interest to be referred for ascertainment, and thereafter to be paid by the petitioner. *In re South Barrule Slate Quarry Co.*, L. R. 8 Eq. 688.

Mr. Justice Miller, after stating the case as above reported, delivered the opinion of the court.

With regard to the main question, the power of the directors and of the majority of the corporation to sell all of the assets and property of the Pewabic Mining Company to the new corporation under the existing circumstances of this case, we concur with the Circuit Court. It is earnestly argued that the majority of the stockholders — such a relatively large majority in interest — have a right to control in this matter, especially as the corporation exists for no other purpose but that of winding up its affairs, and that, therefore, the majority should control in determining what is for the interest of the whole, and as to the best manner of effecting this object. It is further said that in the present case the dissenting stockholders are not compelled to enter into a new corporation with a new set of corporators, but have their option, if they do not choose to do this, to receive the value of their stock in money.

It seems to us that there are two insurmountable objections to this view of the subject. The first of these is that the estimate of the value of the property which is to be transferred to the new corporation and the new set of stockholders is an arbitrary estimate made by this majority, and without any power on the part of the dissenting stockholders to take part, or to exercise any influence, in making this estimate. They are therefore reduced to the proposition that they must go into this new company, however much they may be convinced that it is not likely to be successful, or whatever other objections they may have to becoming members of that corporation, or they must receive for the property which they have in the old company a sum which is fixed by those who are buying them out. The injustice of this needs no comment. If this be established as a principle to govern the winding up of dissolving corporations, it places any unhappy minority, as regards the interest which they have in such corporation, under the absolute control of a majority, who may themselves, as in this case, constitute the new company, and become the pur-

chasers of all the assets of the old company at their own valuation.

The other objection is that there is no superior right in two or three men in the old company, who may hold a preponderance of the stock, to acquire an absolute control of the whole of it, in the way which may be to their interest, or which they may think to be for the interest of the whole. So far as any legal right is concerned, the minority of the stockholders has as much authority to say to the majority as the majority has to say to them, "We have formed a new company to conduct the business of this old corporation, and we have fixed the value of the shares of the old corporation. We propose to take the whole of it and pay you for your shares at that valuation, unless you come into the new corporation, taking shares in it in payment of your shares in the old one." When the proposition is thus presented, in the light of an offer made by a very small minority to a very large majority who object to it, the injustice of the proposition is readily seen; yet we know of no reason or authority why those holding a majority of the stock can place a value upon it at which a dissenting minority must sell or do something else which they think is against their interest, more than a minority can do.

We do not see that the rights of the parties in regard to the assets of this corporation differ from those of a partnership on its dissolution, and on that subject Lindley on Partnership says, Book 3, c. 10, § 6, sub-div. 4, page 555, original edition:

"In the absence of a special agreement to the contrary, the right of each partner on a dissolution is to have the partnership property converted into money by a *sale*, even though a sale may not be necessary to the payment of debts. This mode of ascertaining the value of the partnership effects is adopted by courts of equity, unless some other course can be followed consistently with the agreement between the partners, and even where the partners have provided that their shares shall be ascertained in some other way, still, if owing to any circumstance their agreement in this respect cannot be carried out, or if their agreement does not extend to the event which has in fact arisen, realization of the property by a sale is the only alternative which a court of equity can adopt."

The authorities cited by Lindley for this proposition amply support it.

In the case of *Crawshay* v. *Collins*, 15 Ves. 218, a commission of bankruptcy had been issued against Noble, one of the members of a partnership engaged in the business of manufacturing pumps and engines. The assignee of Noble filed a bill, asking for a division of the assets, which consisted largely of patents, and upon a very full argument upon the subject, Lord Eldon says: "Another mode of determination of a partnership is not by effluxion of time, but by the death of one partner." The question then is, he says, "whether the surviving partners, instead of settling the account and agreeing with the executor as to the terms upon which his beneficial interest in the stock is still to be continued, subject still to the possible loss, can take the whole property, do what they please; and compel the executor to take the calculated value. That cannot be without contract for it with the testator. The executor has a right to have the value ascertained in the way in which it can be best ascertained, by sale."

In 17 Ves. 298, a case more analogous to the present one came before the court. In that case (*Featherstonhaugh* v. *Fenwick*) the parties were engaged as partners in the business of manufacturing glass, and after deciding one of the questions in the case, to wit, that the partnership was dissolved or should be dissolved by decree of the court, the master of the rolls, Sir William Grant, proceeded to say: "The next consideration is whether the terms upon which defendants proposed to adjust the partnership concern were those to which the plaintiff was bound to accede. The proposition was that a value should be set upon the partnership stock, and that they should take his proportion of it at that valuation, or that he should take away his share of the property from the premises. My opinion is clearly that these are not terms to which he is bound to accede. They had no more right to turn him out than he had to turn them out, upon those terms. Their rights were precisely equal: to have the whole concern wound up by a sale, and a division of the produce. As therefore they never proposed to him any terms which he was bound to accept, the

consequence is that, continuing to trade with his stock, and at his risk, they come under a liability for whatever profits might be produced by that stock." He then refers to the case of *Crawshay* v. *Collins*, just cited, with approval.

In the case of *Hale* v. *Hale*, 4 Beavan, 369, Joseph Hale, who carried on the trade of a brewer in partnership with George Hale and two other persons, died leaving a will. The master of the rolls, in discussing the relative rights of the surviving partners and the executor of the deceased, says in regard to the executor: He "is not obliged to submit to the statement of the account which is made by the continuing partners; clearly not, in the absence of all contract to that effect, which is admitted to be the case here. He has a right to say, 'I must have the actual value of my partnership assets determined, and though it may be very inconvenient for you to ascertain the value in the mode prescribed by the law, yet if we cannot otherwise agree, I must have it ascertained by the only mode by which it can be ascertained accurately, namely, by a sale for what it will fetch in the market.'"

The next case, *Wilde* v. *Milne*, 26 Beavan, 504, was a case bearing a closer analogy to this, because the parties were engaged in the mining business, to wit, working a colliery. In consequence of some disagreements, the plaintiff gave notice to dissolve, and instituted this suit to have the partnership wound up. He did not allege that there were any debts, but prayed that the partnership property might be sold and applied to the payment of the debts, and that the surplus might be divided. This was resisted by defendant Milne alone. On the hearing, the master of the rolls, Sir John Romilly, said: "I am clearly of opinion that this is an ordinary case of partnership, and when it is dissolved or terminated, any one of the partners is entitled to have the whole assets disposed of. In this case it is admitted that any one can put an end to the partnership. The result is, that that which forms the partnership assets must be disposed of for the purpose of settling the account between the partners. I consider this established by *Crawshay* v. *Maule*, 1 Swanston, 518, 526." And after pointing out the difficulty in the mode of dividing the property, which consisted

partly of real estate, of the use of the shaft, of the machinery and engines, etc:, he said : "The court is compelled by the exigency and circumstances of these cases to direct a sale."

The case of *Rowlands* v. *Evans* and *Williams* v. *Rowlands*, 30 Beavan, 302, arose out of another partnership in mining business very much like the case before us. Some of the partners interested desired that the mining business might be carried on by a miner and receiver, but the plaintiff objected to this. One of the partners had become a lunatic, and his business was in the hands of a committee, and the question was whether the partnership be dissolved and the property sold, or a receiver appointed to conduct the operations of the concern. The master of the rolls said : " I do not think the point is touched by the decisions. The difficulty is this : the court cannot compel persons to be in this situation ; — either to carry on business with the committee of a lunatic, subject to all the inconveniences of having a manager appointed by the court, . . . and subject to appeal to the House of Lords. . . . No one would bid for a share in a mine to be carried on with the committee of a lunatic, nor could the value of the share of the lunatic be properly ascertained under such circumstances. I think that the value of the whole must be ascertained by a sale by auction, and that some indifferent person well acquainted with these matters should be directed to sell the property, and that all parties should have liberty to bid."

In the case of *Burdon* v. *Barkus*, 4 De G., F. & J., 42, which came before the Lords Justices of Appeal from the Vice Chancellor's Court, Lord Justice Turner, delivering the opinion said : " The next inquiry to be considered is the inquiry as to the valuation of the stock and plant, which is objected to on both sides; by the defendant, as importing that the stock is: to be valued; by the plaintiff, as importing that it might be valued as the stock of a going concern. I think that both of these objections are well grounded. There was no agreement between these parties for the stock and plant being taken by either party at a valuation on the termination of the partnership, and in the absence of such an agreement a partner cannot, as I conceive, be compelled to take, nor can he com-

pel his copartner to take, the stock at a valuation. Each is entitled to have it ascertained by sale, and as to the defendant's claim to have the stock dealt with as the stock of a going concern, I do not see how it can be maintained, for the plaintiff is certainly not bound to continue the concern."

These English authorities would seem to be conclusive of the right of the plaintiffs in the present case to have a sale of the property. The same doctrine is very decisively announced in the case of *Dickson* v. *Dickinson*, 29 Connecticut, 600. This was a bill in regard to a partnership, the main object of which was to procure the division of certain property which the plaintiffs claimed to belong to the partnership. The court said: "The plaintiff has no equitable claim to a decree in his favor. So far as the bill asks for the division of the property, we had supposed this object could only be effected by a sale of the property and a conversion of it into cash, and then dividing the cash, because as between partners there is no other mode, where they do not agree, of ascertaining the value of partnership property or of disposing of it."

The court then refers to the case of *Sigourney* v. *Munn*, 7 Connecticut, 11, and cites the language of Judge Hosmer in that case, as follows: "In every case in which a court of equity interferes to wind up the concerns of a partnership, it directs the value of the stock to be ascertained in the way in which it can best be done, that is, by the conversion of it into money. Every party may insist that the joint stock shall be sold."

In the Supreme Court of Michigan, in *Godfrey* v. *White*, 43 Michigan, 171, which is mainly important as showing the concurrence of the highest court of the State under whose laws the Pewabic Mining Company was organized, that court decided that certain lands which constituted a part of the partnership property should not be partitioned between the partners, but should be sold and the proceeds divided. See also *Briges* v. *Sperry*, 95 U. S. 401.

We do not say that there may not be circumstances presented to a court of chancery, which is winding up a dissolved corporation and distributing its assets, that will justify a decree ascertaining their value, or the value of certain parts of them,

and making a distribution to partners or shareholders on that basis; but this is not the general rule by which the property in such cases is disposed of in the absence of an agreement.

*We are of opinion that on the appeal of the defendants from this part of the decree, it must be affirmed.*

However honest the directors may be who conducted the business of this corporation for nearly a year after its dissolution without any attempt to wind it up, but who, on the contrary, assessed $88,000 on the shares of the stock and collected it, and did much other of the ordinary business of mining operations, it seems to us eminently proper that in this proceeding, by which the court undertook to wind up the affairs of the corporation, to pay its debts, and to realize its assets and distribute them among the shareholders, these directors should account for what they did in that time. We do not decide, nor do we think it was necessary for the court below to have decided, whether those directors had anything in their hands which should be accounted for in the final liquidation of the partnership affairs, or whether they had not. It is the object of such an inquiry as that sought by complainants in their bill to ascertain this fact. It was not a part of the matter referred to the commissioner in the former reference. We think it is a proper subject of investigation to be made by a master to whom the matter shall be referred, with express directions to ascertain and report upon that subject. See authorities already cited.

*That part of the decree, therefore, of the court denying this relief is reversed, and the case remanded to the court below with directions to appoint a master, and to direct such an inquiry and report.*

Bradley, J. I think the opinion of the court asserts too strongly the right of the minority stockholders to insist upon a sale. In many cases in this country a valuation of the interest of a minority, under the direction of the court, has been deemed a proper method of ascertaining their share in the assets, where a sale would be prejudical to the interests of the whole.

Mr. Justice Gray was not present at the argument, and took no part in the decision of this case.