FERRY v. LATROBE STEEL CO. et al.

(Circuit Court, E. D. Pennsylvania. July 29, 1907.)

No. 31, April Sess. 1906.

CORPORATIONS—VOLUNTARY LIQUIDATION — POWERS AFTER SUSPENSION OF BUSINESS.

Where a manufacturing corporation has sold its plant, good will, and property, and by the action of its directors and stockholders abandoned its corporate business and entered upon liquidation, proceeding so far as to make distribution of the greater part of its assets among its stockholders, it has no power, over the objection of a stockholder, to invest cash which has been collected, and is merely awaiting distribution, in the stock of another corporation, although it is the intention to distribute such stock in specie among its stockholders.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 12. Corporations, §§ 2458–2460.]

In Equity. On final hearing.

Frank R. Lawrence, Lester B. Johnson, Frank Lawrence and John F. Keator, for complainant.

John G. Johnson, for respondent.

J. B. McPHERSON, District Judge. The complainant, who is a citizen and resident of the state of New York, has filed this bill against the defendants, who are corporations of Pennsylvania and of New Jersey, respectively, for equitable relief under the following facts, none of which is in serious dispute:

The Latrobe Steel Company (hereinafter called the "Steel Company") was organized on or about August 15, 1895, under the Pennsylvania statute, for the purpose of manufacturing iron and steel and other metals, and articles of commerce from metal or wood, or both. It had and has a capital stock amounting to $1,500,000, divided into 15,000 shares, of the par value of $100 each, and all of this stock was issued to, and is held and owned by, sundry stockholders. At the times hereinafter named the complainant and his wife were, and they still are, the owners and holders of 500 shares, of the aggregate par value of $50,000. In addition to these 500 shares, ever since the organization of the company, until November 17, 1905, the complainant was the owner of 1,100 other shares, of the par value of $110,000. In November, 1905, he transferred the legal title to these 1,100 shares to another person, but regained the title in October, 1906. Soon after its organization the Steel Company began the corporate business for which it was chartered; this business consisting in the manufacture and sale of car couplers, and of tires for the wheels of railroad cars, and carried on the manufacture until on or about January 9, 1906, when it conveyed its property and ceased to manufacture, as will be presently set out more at length. Its plant was situated in the state of Illinois.

The Latrobe Steel & Coupler Company (hereinafter called the "Coupler Company"), a corporation of New Jersey, was organized in 1898 to comply with what was believed to be the requirements of the laws of Illinois, and was chartered to carry on the Steel Company's business

155 F.—11

of manufacturing and selling couplers. It had, and has, a capital stock issued and outstanding amounting to $300,000, divided into 300 shares, of the par value of $100 each. All of its stock, ever since its organization, has been owned and held by the Steel Company, having been issued in consideration of the transfer to the Coupler Company of the Steel Company's coupler business and plant.

On and before November 16, 1905, the Steel Company owned an extensive manufacturing plant, consisting of real estate, buildings, other structures of various kinds, tools, machinery, and sundry appliances, situated at Latrobe, in the state of Pennsylvania, where its business was then carried on. On that day it entered into a written agreement with the Railway Steel Spring Company, a New Jersey corporation (hereinafter called the "Spring Company"), which agreement is as follows:

"Agreement made this 16th day of November, 1905, between Latrobe Steel Co., a corporation of Pennsylvania, hereinafter called 'vendor,' party of the first part, and Railway Steel Spring Co., a corporation of New Jersey, hereinafter called 'purchaser,' party of the second part.

"Said parties, each in consideration of the agreements of the other herein stated, and vendor in consideration of the partial payment made to it by purchaser, and hereinafter stated, mutually agree as follows:

"Vendor agrees to sell, convey, transfer and deliver to purchaser, at the price and upon the terms and conditions hereinafter stated, all vendor's manufacturing business and properties, including all vendor's real estate, plants, furnaces, structures, machinery, tools and appliances (including manufacturing books, accounts and data of costs, but excluding books of account of the business other than those containing accounts thereof, since November 1st, 1905); all materials and supplies and all manufactured product and material in process of manufacture, and all patents, processes, inventions, rights under, and interests in and claims to, patents, processes and inventions (including all the Griffith and other inventions and patents relating in any way to car wheels), trade marks, trade rights and trade names of every sort and kind to it belonging, and the good will of said business, and the exclusive right to use the name 'Latrobe Steel Company' in carrying on said business, and all leaseholds, contract and other rights, privileges and franchises used or of use in or in connection with, or acquired for, said business, and all gas, power, light and other tributary properties, being substantially all the properties of every kind and wheresoever situate of vendor, excepting cash, shares of stock of the Latrobe Steel & Coupler Co. (which company is to be permitted to continue business under that name), bills and accounts receivable.

"The sale and transfer of the properties hereinbefore described is to be as of November 1, 1905, and from that date it is understood that the business and properties aforesaid have been and will be operated for account and at the expense of purchaser.

"Deeds, bills of sale and other instruments of transfer of said properties, shall be delivered at the office of Harvey Fisk & Sons in the city of New York on the 2d day of January, 1906, or earlier in case transfers and examinations of title and the requisite corporate action shall be ready earlier, and such transfers and the instruments thereof shall be supported by such corporate action, and action of individual stockholders, of vendor as shall be requisite to make such transfers wholly legal and effective, which action vendor shall cause to be taken at the earliest moment.

"At the time of such transfers vendor will cause to be executed and delivered to purchaser an agreement not to engage in the tire, car wheel, or ring manufacturing or selling business or any branch thereof in the United States or Canada (except in connection with purchaser), for the period of ten years, executed by M. O. Smyth, president of vendor, and vendor will use its best efforts to cause a like agreement to be so executed and delivered by each of the following: C. C. Warren, G. Aertsen, J. K. Griffith, J. M. Howard.

"Immediately after the transfer by vendor to purchaser as hereinbefore provided, vendor will proceed with the liquidation of its business and properties and distribution thereof among its stockholders, and will thereupon be dissolved as a corporation, and will notify purchaser forthwith of such dissolution.

"The purchase price hereinbefore referred to is four million three hundred thousand dollars ($4,300,000), and, in addition thereto the book value (but not exceeding the cost paid by purchaser) of materials, supplies, finished products and materials in process of manufacture, which vendor had on hand at the close of business on October 31, 1905, and purchaser shall have access to vendor's books and works prior to transfer hereunder in order to ascertain or verify the exact amount of such materials, supplies, product and material in process of manufacture. Purchaser shall also have access to the books of account, records and papers retained by vendor after transfer pursuant thereto, for all entries and other data useful for the conduct of the business by purchaser.

"Said price is payable as follows:

"$500,000 thereof on the execution and delivery of this agreement, and vendor hereby acknowledges receipt thereof from purchaser.

"$500,000 thereof on the delivery of deeds and instruments of transfer as hereinbefore provided.

"The balance of fixed purchase price in equal installments of $825,000 each, one, two, three and four months respectively, after the delivery of deeds and instruments of transfer.

"But purchaser shall have the right to anticipate any and all payments in whole or in part. Such deferred payments shall be secured by the deposit with Drexel & Company of bonds of the issue which purchaser proposes to make and secure, or cause to be made and secured, by first mortgage (which bonds and mortgage shall be in the form usual in such cases) upon the properties so to be transferred to it by vendor, amounting in aggregate principal amount to the same proportion of the whole issue, as the amount of the deferred payments bears to $4,300,000; such deposit to be accompanied by appropriate documents providing for the retention of such bonds as security for such deferred payments (proportional amounts to be released as installments are paid) and for the usual remedies in case of default; but this deposit of bonds, shall not in any way discharge or diminish the absolute liability of purchaser to pay every installment of purchase price at the time herein fixed therefor.

"The price of materials, supplies, product and materials in process shall be paid within thirty days after the determination of the amount thereof, which determination shall be made as rapidly as possible.

"All installments of purchase price (including that for materials supplies and products) shall carry interest at five per cent., from November 1st, 1905, to date of actual payment.

"The properties of vendor so to be transferred to purchaser shall be free and clear of all incumbrance and indebtedness whatsoever, as of November 1, 1905, excepting only the contracts hereinafter agreed to be assumed by purchaser; and the full sum of $238,000 has been, or will be, paid by vendor toward the cost of the additions to plant and new construction now going on. And all mills, machinery tools and appliances of every kind herein agreed to be transferred shall be free and clear of all liability to pay royalty or other liability or incumbrance of any kind to patent owners or licensees. Vendor will also pay all taxes on its properties so to be transferred for the current tax fiscal year.

"Purchaser agrees to buy from vendor the properties hereinbefore described, and to pay therefor the price hereinbefore stated, at the times hereinbefore fixed, and further agrees to assume and perform the outstanding contracts of vendor listed in the schedule hereto annexed marked A, 1, 2 and 3 and all vendor's obligations under them or any of them. As to any omitted contracts mentioned in page 3 of said Schedule A-3, purchaser will assume any such, provided they are reasonable in character and made in the ordinary course of business.

"This agreement shall be binding upon and enforceable by the successors and assigns of the parties hereto respectively.

"In witness whereof hereunto in duplicate the said parties have set their seals, and the signatures of their presidents, respectively the day and year first above written.

    "[Seal.]               Latrobe Steel Company,
                      "By Marriott C. Smyth, President.
  "Attest.  Chas. C. Warren, Secretary.

    "[Seal.]             Railway Steel Spring Company,
                    "By J. E. French, President."

On November 18, 1905, at a special meeting of the board of directors of the Steel Company, the following resolution was passed:

"Resolved, that we unanimously do approve the sale of our property to the Railway Steel Spring Company as embodied in form of contract or agreement which has been prepared, and that we do authorize the execution by the president under seal of the company of said sale and contract."

The contract or agreement thus referred to is the same agreement just set forth in full, and was spread at length upon the minutes of the meeting. On November 22, 1905, the Steel Company, by a circular letter signed by its president, notified its stockholders that the agreement of November 16, 1905, with the Spring Company had been executed. The letter is as follows:

                      "Philadelphia, November 22, 1905.

"Dear Sir: I beg to advise you that your board have sold the plant of the Latrobe Steel Co. for $4,300,000 cash. Agreement has been signed and $500,-000 paid. When deeds, etc., are delivered, an additional sum of $500,000 will be paid, and $825,000 monthly thereafter until the purchase price has been paid in full.

"Our company retains all its assets, such as cash on hand, bills and accounts receivable, material (which latter will be sold for cash), and the stock of the Latrobe Steel & Coupler Co.

"By the time the Latrobe Steel Co. is liquidated, you will have received your proportion of the stock of the Latrobe Steel & Coupler Co., in addition to your proportion of the cash received for the plant of the Latrobe Steel Co. as above.

"The sale is a very advantageous one, and I trust to receive all the papers enclosed, properly signed and returned to me promptly.

"Just how much the stockholders of the Latrobe Steel Co. will receive per share for their stock is still uncertain, but the sale will net them a very handsome and substantial profit on their investment.

    "Yours very truly,            Marriott C. Smyth, President."

At the annual meeting of the stockholders of the Steel Company, held December 18, 1905, the president reported inter alia as follows:

"As you have already been notified by circular and letter, the works of the Latrobe Steel Company have been sold to the Railway Steel Spring Company for $4,300,000, your company retaining all of its assets, such as cash, bills and accounts receivable, and the stock of the Latrobe Steel & Coupler Company.

"When all moneys due us are collected, we anticipate the stockholders will receive not less than $400 per share for their stock.

"Your board deemed this sale a very wise one, and the acquiescence to the sale by a large majority of the stockholders has confirmed their action.

"In this, the last report of the board of the Latrobe Steel Company to its stockholders, it is proper to congratulate them on the remarkable success of the company from its inception. Starting as it did with but $600,000 capital, which was subsequently increased to $1,500,000, it has paid the stockholders in dividends $2,381,700, and will receive for the works, with the cash assets

retained, in round numbers, about $7,000,000, being a total return for the investment of over $9,000,000, exclusive of the stock of the Latrobe Steel & Coupler Company.

"After the distribution of cash received from the sale of the works and the liquidation of the company is completed, the stock of the Latrobe Steel & Coupler Company will be divided pro rata among the stockholders of the Latrobe Steel Company, and, although it is improbable that any such dividends will be made on the Coupler Company stock as has been on the Steel Company's stock, we look forward to the Coupler Company's doing a good business and making fair returns.

"Respectfully submitted on behalf of the board.

"Marriott C. Smyth, President."

This report was accepted by the stockholders' meeting, and directed to be entered at length upon the minutes.

On December 26, 1905, at a special meeting of the stockholders of the Steel Company, called for that purpose, the following action was taken, as appears from the minutes:

"The chairman stated that the first business before the meeting, in accordance with advertisement, was the confirmation of the sale of the property of the Latrobe Steel Company to the Railway Steel Spring Company on the terms approved by the board of directors as embodied in the following agreement: [Being the agreement of November 16, 1905, which is set forth in full in the minutes of the special meeting.]

"On motion, duly made and seconded, it was

"Resolved, that we do approve of the sale of the property of the company as made by the board."

Out of a total issue of 15,000 shares, 14,399 shares voted in favor of the resolution; but complainant did not vote the 500 shares of which he and his wife were then the owners upon the adoption thereof.

On or about January 9, 1906, the Steel Company executed and delivered to the Spring Company a deed and bill of sale conveying to the Spring Company the properties and rights agreed to be granted and conveyed by the agreement of November 16, 1905, and on or about January 9th delivered possession to the purchaser of the properties so conveyed. The full purchase price named in the agreement has been paid to the Steel Company by the Spring Company.

At a special meeting of the board of directors of the Steel Company, held January 13, 1906, the following resolutions were passed:

"Resolved, that the sum of $100 per share be distributed to the stockholders of this company, as they appear of record upon its books, upon production of the certificate therefor to Drexel & Co., in order that the amount of said payment may be indorsed thereon.

"Resolved, that all such payments be made by check marked as 'On account of liquidation of this company.'

"Resolved, that Drexel & Co. be requested, upon presentation of the certificates for that purpose, to stamp upon each certificate an indorsement showing the amount paid per share and date of such payment.

"Resolved, that the president and treasurer of this company be authorized, upon receipt of the remaining payment stipulated for in the agreement with the Railway Steel Spring Company, and of the other amounts due this company, to make from time to time further distributions to the stockholders of this company in liquidation of its assets in the same manner as provided in the foregoing resolutions.

"Resolved, that we approve of the sending to the stockholders the letter prepared by the president announcing the liquidation together with the form of letter to Drexel & Co. and of the receipt by them for the certificates, as follows:

" 'Philadelphia, January 16th, 1906.

" 'Dear Sir: The property of this company has in pursuance with the authority given at the stockholders' meeting held December 26th, 1905, been sold to the Railway Steel Spring Co. for $4,300,000 cash. Part of this amount has already been paid, and the balance is secured by bonds deposited with Drexel & Co. as trustee.

" 'The board of directors has resolved that out of this sum there shall be distributed to the stockholders of record on the company's books, in liquidation of the company's affairs, as first payment, the sum of $100 per share on presentation of the certificates of stock to Drexel & Co., Philadelphia, Pa. In order that the amounts now and hereafter to be paid may be noted thereon as made, please forward immediately your certificate of stock, with power of attorney properly signed and witnessed, to Drexel & Co., Philadelphia.

" 'Further distributions will be made from time to time as the balance of the purchase price is paid. These distributions will also have to be noted on the certificate. We therefore advise you that you authorize Drexel & Co. to retain your certificate for this purpose, and inclose a form of letter to be filled up and signed by you to that effect. On receipt of certificate of stock and letter, they will give you a proper receipt.

" 'Yours truly,            Latrobe Steel Co., Marriott C. Smyth, Prt.'

" '(Form of Letter.)

" 'January ———— 1906.

" 'Messrs. Drexel & Co., Philadelphia—Gentlemen: In accordance with the instructions of the company in its circular letter of the 16th inst., I herewith inclose certificates Nos. ———— for ———— shares of the capital stock of the Latrobe Steel Company, the property of the undersigned, in order that payment of $100 per share, in liquidation, now authorized may be noted thereon. You may retain the same in order that subsequent payments, in liquidation, may be noted on them as made.

" 'Please acknowledge and forward receipt for the inclosed certificate, as mentioned in the company's letter.

" 'Yours very truly.'

" '(Form of Receipt.)

" 'Received January ———— 1906, from ———— certificates Nos. ———— for ———— shares of the capital stock of the Latrobe Steel Company, standing in the name of ———— to be retained on deposit by the undersigned in order that payments in distribution made on account of the liquidation of the affairs of that company may be noted thereon, in accordance with the terms of the circular letter from the company to its stockholders under date of January 16th, 1906, and of the letter addressed to the undersigned by you, dated ————.

" 'Drexel & Company.' "

Payments of cash aggregating $6,000,000, or $400 on each share of stock, have been made to the stockholders of the Steel Company in liquidation of its assets. These payments were made in four sums of $1,500,000 each, at the dates presently to be mentioned; and, as the stockholders received the payments, they were required to present their stock certificates for the following indorsements thereon:

"There has been paid in liquidation of the assets of the Latrobe Steel Company, upon the shares included in this certificate, the sums hereunder noted, to wit:

| | | |
|---|---|---|
| January 17, 1906 | $100 | per share. |
| January 29, 1906 | $100 | per share. |
| February 5, 1906 | $100 | per share. |
| February 13, 1906 | $100 | per share." |

At the time the fourth payment in liquidation was made by the Steel Company, the stockholders were notified as follows:

"Philadelphia, February 7th, 1906.

"Dear Sir: The 4th payment of $100 per share in liquidation of the Latrobe Steel Company will be payable on Feby. 13th, 1906. Please forward to Messrs. Drexel & Company, Philadelphia, in the inclosed envelope, the receipt they issued to you for the stock deposited with them, so that the payment may be indorsed thereon.

"The receipt will be returned to you properly stamped, with check for $

"Yours very truly, Latrobe Steel Company,

"Marriott C. Smyth, President."

"The next dividend which will be paid to the stockholders in liquidation of the Latrobe Steel Company will be the final dividend. It will not be paid until all the moneys due the company have been collected. Due notice will be given when the time for such payment arrives."

Since January 9, 1906, the Steel Company has not carried on, but has wholly ceased to transact, any of the business for which it was chartered; neither has it exercised since that date any corporate function whatsoever, except for the purpose of liquidating and distributing its assets, and except for the further purpose complained of in the pending bill. By reason of the sale and delivery of its manufacturing plant and other property, of its good will and the exclusive right to use its name in carrying on its former business, and by reason also of the nearly complete liquidation and distribution of its assets, the Steel Company, in its present condition, is incapable of resuming or further carrying the business on for which it was incorporated.

This brings us to the matter in dispute. On May 21, 1906, the Steel Company by order of its board of directors sent the following letter to its stockholders, together with a notice calling them together in a special meeting on June 11, 1906:

"Philadelphia, May 21st, 1906.

"Dear Sir: The stockholders of the Latrobe Steel Company are probably aware that all of the stock of the Latrobe Steel & Coupler Company, amounting to $300,000, is owned by the Latrobe Steel Company, and that the Steel Company has heretofore furnished the Coupler Company with the necessary funds to conduct its business. In order to continue the coupler business the capital must be increased to $1,000,000.

"It is proposed to accomplish this by purchasing 7,000 shares of the Latrobe Steel & Coupler Company stock at par, using for the purpose $700,000 of the funds of the Latrobe Steel Company now in hand secured in the liquidation of that company.

"If this plan meets the approval of the shareholders, a distribution of this Coupler Company stock will be made among them which will amount to 66⅔ per cent. of their present holdings of the stock of the Latrobe Steel Company. In addition to this, they will receive a further sum of about $35 per share in cash in final liquidation of the Latrobe Steel Company.

"Your board recommends this plan for your approval, and believes that the Latrobe Steel & Coupler Company will thus be established on a substantial basis and that it should make good returns to its shareholders.

"Board of Directors,

"Marriott C. Smyth, President."

On June 11, 1906, the special meeting of the stockholders was held, and the following resolution was passed:

"Resolved, that the officers of the Latrobe Steel Company be and they are hereby authorized to purchase at par for cash seven thousand (7,000) shares of the stock of the Latrobe Steel & Coupler Company at the par value of $100 per share, and to take such steps as may be necessary to carry out the final liquidation of the company in accordance with the terms of the circular letter of May 21, 1906."

In pursuance of this action of the board and of the stockholders, there is no doubt, and I find as a fact, that (if the present bill had not been filed on June 21, 1906) the Steel Company was about to employ $700,000 of the money acquired by it in liquidation of its assets, in order to buy 7,000 shares of the capital stock of the Coupler Company, and that it intended to distribute afterwards these 7,000 shares among its stockholders in place of the cash used in such purchase. These shares of the Coupler Company were not to be converted into cash, but were to be distributed in specie among the stockholders of the Steel Company. In consequence of the filing of this bill, however, the Steel Company has not yet subscribed or paid any money in pursuance of the resolution passed on June 11th, and none is expected to be subscribed or paid until the end of this litigation.

The complainant did not agree to this resolution, but voted in opposition the 500 shares that were held or controlled by him on June 11th—300 shares being in his own name, and 200 shares being in the name of his wife. He and his wife also protested against the proposed action, as will appear by the following extract from the minutes of the meeting:

"Mr. C. H. Ferry and Mr. Frank R. Lawrence, attorney for Mrs. Emily Mansfield Ferry, offered the following joint protest against the proposed action of the Latrobe Steel Company in the purchases of the Latrobe Steel & Coupler Company's stock:

"'June 11, 1906.

"'To the Latrobe Steel Company and to the Directors, Officers and Stockholders Thereof:

"'The undersigned stockholders of said company demand that the liquidation and distribution of the assets thereof be completed without unnecessary delay, and that they be respectively paid their proportionate shares thereof.

"'The undersigned protest against the making of any subscription by or on behalf of said company to the stock of the Latrobe Steel & Coupler Company, and give notice that in case any of the funds or assets of said Latrobe Steel Company are used or applied in payment of any such subscription such use or payment will be an unlawful diversion of such funds or assets for which said Latrobe Steel Company, and all persons taking part therein will be liable to the undersigned who will take such measures with respect thereto as they may be advised.

"'Charles H. Ferry,
"'Emily Mansfield Ferry,
"'By Frank R. Lawrence, Her Proxy and Attorney.'"

The following additional facts have more or less relevancy in certain aspects of the case: The Coupler Company is now solvent, and has been solvent for some time before the beginning of this action. In or about the year 1902 the Coupler Company owed the Steel Company $750,000 for money previously loaned for the erection of a new and extensive plant, and for advances necessary to carry on its large and increasing business; but this indebtedness was reduced before November 14, 1905, from the earnings of the Coupler Company's business, to the sum of $275,000, and in this amount the Coupler Company is still indebted to the Steel Company. On August 31, 1906, the Coupler Company owned assets sufficient to pay all its liabilities in full, including its debt to the Steel Company; to pay its capital stock of $300,000 in full; and, after so doing, to leave a surplus exceeding $600,000. The valuations placed upon the assets of the Coupler Company in a

balance sheet dated August 31, 1906, from which the figures just stated have been taken, are conservative valuations, and it seems safe to say that the evidence shows the value of its $300,000 of stock to be not less than $900,000. It is also true that upon the financial statements of the Coupler Company, that were offered in evidence, no credit is taken for the value of its good will, and that its plant is carried upon the books at about $400,000. In my opinion this amount is too small. Indeed, the president of the Coupler Company who has filled that office, and has also been the active head and manager of both companies, ever since their organization, testified that he would not be willing to advise the Coupler Company to accept $1,000,000 for its bare plant; and I believe the finding to be justified that the value of the plant exceeds considerably the sum at which it is carried upon the company's books. As further evidence of the value of the plant and the capital stock, it may be noted that the net profits for the fiscal year 1905 were $359,-093.87; for the fiscal year 1906, more than $300,000; and for the period from November, 1906, to February, 1907, inclusive, about $130,000. Since August 31, 1906, the Coupler Company has had on hand more cash than would pay its debt of $275,000 to the Steel Company. The profits just mentioned from the Coupler Company's business for the period ending with January, 1907, were earned by the use of its own capital and surplus, exclusive of the sum of $275,000 which it owes to the Steel Company; for it was able to repay this sum at any time during the period named, out of cash on hand and not in use. On February 25, 1907, there was due and owing to the Coupler Company from sales made, $361,699.60; on the same day the company had $284,000 worth of material on hand that had been paid for; and, after paying every matured or presented indebtedness, excepting only the $275,000 due to the Steel Company, the Coupler Company had a cash balance on hand of $313,098.03, more than enough to pay its indebtedness to the Steel Company. These conditions are fairly representative of its general financial condition. In addition to the $275,000 owing to the Steel Company, the Coupler Company, at no time during the month of October, 1906, had a less amount of cash on hand than $81,000; during November never less than $77,000; during December, never less than $72,000; during January, 1907, never less than $102,000; during February, 1907, never less than $38,098.03; and the average daily cash balances during said months, in addition to the sum of $275,000 due the Latrobe Steel Company, were in

| | |
|---|---|
| October | $ 92,634.41 |
| November | 104,054.41 |
| December | 117,849.90 |
| January | 123,868.91 |
| February | 85,485.75 |

The proposed subscription of $700,000 from the funds of the Steel Company to the capital stock of the Coupler Company is not necessary to enable the latter company to pay its debt to the former, or to carry on and continue its original business with success. The principal object, to which the proposed new capital of $700,000 is to be devoted, is the erection of a new casting plant by the Coupler Company, and this is a distinct and separate kind of business from that in which

it is now engaged. This casting plant is expected to cost $500,000, exclusive of the cost of the necessary ground; and this sum will only provide for the cost of the plant itself, leaving additional working capital to be also provided in order to operate the plant. It is evident, therefore, that the Coupler Company intends to use much the greater part of the proposed new capital of $700,000 in establishing a general casting business, and that this is separate and distinct from its former business of manufacturing couplers. A general casting business embraces the making of castings for use in the manufacture of machines, in the erection of buildings, in the frames of cars, in making anvils for hammers, and generally in the construction of many varieties of manufactured metal.

As I have already stated, there is no serious dispute about these facts. The controversy is waged concerning the proper inferences that should be drawn, and concerning the right of the directors and of the majority stockholders of the Steel Company to exercise what they believe to be a sound business judgment in regard to the future of the Coupler Company's affairs. The defendants' position is clearly expressed in the following extract from pages 4 and 5 of their answer:

"The directors of the Latrobe Steel Company were and are unanimously of the opinion that it would be greatly prejudicial to the interest of the stockholders of the Latrobe Steel Company to distribute the shares of the Coupler Company amongst the stockholders without making proper provision for the continued conduct of said Coupler Company in the future without sacrifice.

"Not only it was and is impossible for the Coupler Company to pay its debt of $275,000 or any part thereof consistently with the continuance of its business in the future, but it was and is impossible, in the opinion of the directors, successfully to conduct and manage its business without capital sufficient to enable it to make additions and improvements such as are required to be made to enable it to compete with its competitors. A reserve capital is believed to be essential.

"It will be no longer possible for the Coupler Company, from time to time, to obtain the capital required from the Steel Company. To borrow such capital would injure its credit and would greatly imperil the future value of its shares.

"The directors of the Steel Company are unanimously of the opinion that the proper method to protect the value of the investment already made by the Steel Company in shares of stock and loans to the Coupler Company will be to liquidate the indebtedness owing by the Coupler Company by the issuance to the Steel Company of additional shares of stock to the extent of $275,000 and by the further issuance to it for cash of additional shares of stock to the extent of $425,000 sufficient to enable it to conduct its business properly.

"The directors of the Steel Company were and are unanimously of the opinion that the Coupler Company will be able, by the possession of a capital amounting to $1,000,000 thus issued to conduct a safe and prosperous business, whereby the investment of $575,000 heretofore made and now held by the Steel Company will be assured. In their opinion, any other course of dealing will greatly imperil the value of their investment. In their opinion, the proper method of realizing for the stockholders of the Steel Company the value of the investment already made will be to issue to the Steel Company shares of the Coupler Company to the additional amount of $700,000, of which the proceeds to the extent of $275,000 will be used to liquidate the indebtedness of the Coupler Company to the Steel Company, and of which the remaining proceeds, viz., $425,000, will be used as additional capital in the carrying on by the Coupler Company of its business."

The foregoing facts support the legal proposition upon which the complainant relies, namely, that since the Steel Company has, by agree-

ment and by vote of its stockholders, undertaken to liquidate and distribute its assets, has abandoned its corporate business, has sold almost all of its corporate property, has actually begun and nearly carried through the distribution of its cash among the stockholders, it cannot now, of a sudden, cease the process of liquidation and distribution, and invest a part of its cash, that is merely awaiting distribution, in the stock of another corporation, thus compelling its own dissenting stockholders to embark in a business enterprise against their will. This position I believe to be sound. The subscription of $700,000 proposed is obviously not liquidation at all. On the contrary, it is investment; and, while it may be the part of business prudence to enlarge the Coupler Company's plant and facilities, so that it may carry on two kinds of manufacturing instead of only one, the Steel Company is, I think, without power to devote any of its funds to this object, under the facts as they have already been set forth. Whatever right, derived from either the Pennsylvania statutes or from any other source, the Steel Company may have had, while it was a going concern, actively engaged in carrying on its corporate business, to subscribe to the stock of a manufacturing company chartered by the state of New Jersey, it seems to me to be clear that the right was lost after the Steel Company had gone so far upon the road to dissolution. Suppose the process of liquidation had been complete, and that all the assets had been converted into cash, ready to be distributed—could it be doubted that neither the directors nor the majority of the stockholders could embark any part of this cash in a new venture, so as to bind a minority stockholder who refused to take part in the enterprise? Under the facts before the court, the difference is one of degree mainly, for I think no difference in principle appears. It is doubtless true that the proposed subscription to the Coupler Company's stock is in good faith regarded by the directors and the majority stockholders of the Steel Company as a highly desirable step to take; and it may even be conceded, for the immediate purpose, that their business judgment is correct, and that in all probability the result of the proposed subscription would be to enhance the value of the Coupler Company's stock, both the shares now held and those proposed to be acquired by the Steel Company. But, even if these be assumed to be the facts, I am still of opinion that the complainant cannot be compelled to take the risk of subscription; that he has a right to his share in cash of the money that the Steel Company proposes to divert to the uses of another corporation; and that he is, therefore, entitled to such equitable relief as will protect so much of his property from being devoted to an object to which he is opposed. The brief of complainant's counsel refers to many decisions that support the propositions just stated, but I shall not delay this opinion by taking the time necessary to discuss them. The reasoning of Mason v. Pewabic Mining Co., 133 U. S. 50, 10 Sup. Ct. 224, 33 L. Ed. 524, Lauman v. Railroad Co., 30 Pa. 42, 72 Am. Dec. 685, and Clearwater v. Meredith, 1 Wall. 25, 17 L. Ed. 604, to name no others, is instructive, and justifies, I think, the conclusions to which I have come.

The bill raises no question concerning the right of the Steel Company to distribute among its own stockholders in specie the 3,000 shares

of the Coupler Company. Assuming ‘this right to exist, or—what comes to the same thing—the consent of the Steel Company's stockholders to accept these shares instead of requiring what might be a ruinous sacrifice by a forced sale, the Coupler Company may then be in a situation to take such steps for its own business advancement as it may think wise. But this is a different question, and I express no opinion about it.

In reply to a part of the defendants' argument, I may add that I do not regard as important the fact that a formal dissolution of the Steel Company has not yet taken place. Obviously, if the corporation had been actually dissolved, there could be no such question as is raised by the bill; for the power to carry on the corporate business would have ceased and the company's affairs would be in the course of administration by a judicial tribunal, or in some other manner. The controlling facts here are that the company undertook to liquidate and dissolve, that the process of liquidation and distribution has gone so far as to be nearly complete, that the corporate business has been wholly abandoned, and therefore that the corporate organization —so it seems to me—exists in effect for the mere purpose of dividing the remaining assets among the stockholders, and not for the purpose of taking up again, and using, corporate powers that have been already relinquished. Of course, the unanimous consent of the stockholders would leave nobody to object; there being no creditors, and the interest of the state being laid aside without consideration. But, in the face of objection by a dissenting stockholder, I think the courts are bound to protect his rights, and to see that he gets his share of the money that is now on hand, ready to be distributed.

It remains to pass upon the respondents' motion to strike out certain testimony taken by the complainant in support of the supplemental bill. It is needless to go into this matter fully. I have given it careful consideration, and am clearly of opinion that the motion should prevail. It was unnecessary for the complainant to prove more than the bare facts that he had sold 1,100 shares of his holdings, and that he had been successful in a suit to reclaim them. The details of the litigation were irrelevant. The complainant should therefore pay the costs of the supplemental bill, and also of taking and printing the testimony referred to in the motion to strike out. The remaining costs should be paid by the Steel Company.

A decree may be drawn as prayed for by the bill.